Filed 3/13/15

CERTIFIED FOR PARTIAL PUBLICATION[*]


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D066979 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1002669) |
| ROBERT FRANK VELASCO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County,

Eric M. Nakata, Judge.  Affirmed in part; reversed in part; remanded with directions.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant

and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General,

Eric A. Swenson and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and

Respondent.

_____

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for
publication with the exception of parts II and III.

The jury convicted Robert Frank Velasco of attempted first degree robbery (Pen. Code,[1] §§ 664/211; count 1); assault with a firearm (§ 245, subd. (a)(2); count 4); possession of a firearm by a felon (§ 1201, subd. (a)(1); count 5); and street terrorism (§ 186.22, subd. (a); count 6). The jury also found, as to counts 1 and 4, that Velasco personally used a firearm within the meaning of section 12022.5, subdivision (a). The jury found Velasco not guilty of first degree burglary (§ 459; count 2). It also returned a not true finding on the robbery in concert within the meaning of section 213, subdivision (a) in connection with count 1. In addition, the jury was unable to reach verdicts that counts 1, 4, and 5 were committed for the benefit of, at the direction of, or in association with, a criminal street gang, within the meaning of section 186.22, subdivision (b)(1).

Velasco subsequently admitted one prior strike conviction (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)); one prior serious felony conviction (§ 667, subd. (a)(1)); and one prison prior (§667.5).

The court sentenced Velasco to prison for 28 years eight months.

Velasco appeals, contending: (1) insufficient evidence supports his conviction for street terrorism; (2) his verdict under count 1 must be reduced to second degree robbery under section 1157; and (3) the court should have stayed portions of his sentence for counts 4 and 5 under section 654.

In the published portion of this opinion, we determine that Velasco's conviction for street terrorism is not supported by substantial evidence. Specifically, as a matter of

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

first impression, we interpret section 186.22, subdivision (a) as requiring the defendant to promote, further, or assist in any felonious criminal conduct with a member of the defendant's criminal street gang. Because there is no evidence in the record that Velasco engaged in any felonious activity with another member of his gang, his conviction for street terrorism cannot stand.

In the unpublished portion of this opinion, we determine Velasco's other claims lack merit. However, because we conclude substantial evidence does not support Velasco's conviction for street terrorism, we do not reach Velasco's argument that his sentence under count 5 should be stayed pursuant to section 654.

## FACTUAL BACKGROUND

### A. Offenses

In November 2010, Marvin Bransford lived with his girlfriend Joanne[2] in a mobile home park in Victorville. Their mobile home was located in space No. 9. The home had a front and back door, two bedrooms toward the rear with a bathroom in between them, and a kitchen and living area. Bransford and Joanna slept in one bedroom, while the other bedroom was vacant, but had been occupied by Bransford's mother until she moved to a convalescent home. Brenda de la Paz had lived in the trailer park in space No. 5, but moved out. She returned to the trailer park frequently to visit people she knew. Bransford's half-brother Billy Stephens also lived in the trailer park.

---

[2] Joanne's last name was not indicated in the record.

3

The night of November 28, 2010, at around 11:00 p.m., de la Paz knocked on Bransford's door. It was a cold night and she was not dressed for the weather. She asked Bransford if she could spend the night. He agreed, and allowed her to sleep in the spare bedroom. When Bransford got out of bed at 9:00 or 10:00 a.m. the next morning, she was gone. She returned by herself at 12:00 or 1:00 p.m. She came to the door, said she would be back later, and left. That afternoon, de la Paz, an unidentified man, and Velasco, went over to Stephens's trailer. She introduced Velasco to Stephens as "Joker."[3] One of the two men asked Stephens if he had any money. Stephens said he did not. Stephens talked to the three for several minutes and then they left.

The group proceeded to Bransford's trailer. They pulled up in an older white Honda and parked. De la Paz was in the back seat. The driver stayed in the car, while de la Paz and Velasco got out. Velasco was dressed for the cold weather and was wearing a scarf, which covered most of his face.

When they arrived, Bransford was out in the yard working. De la Paz asked Bransford if they could come in. As they were entering the residence, de la Paz introduced Velasco as "Toker." Once they were inside, Bransford sat down on the couch in the living room, while Velasco and de la Paz remained standing. De la Paz accused Bransford of taking her coat, and said she was missing $40, which Bransford owed her. Bransford told de la Paz that he had no idea what she was talking about. Velasco asked Bransford, "Have you ever been pistol whipped?" Bransford responded, "No." Velasco

_____

3    In a police interview a short time after the offense, Stephens said Velasco was introduced as "Toker."

4

removed a handgun from his waistband, and struck Bransford three or four times in the head and face with the gun. Velasco said, "You have to have her $40." Bransford told Velasco he did not owe de la Paz any money and did not have $40. Velasco struck him three or four more times with the gun.

De la Paz went to the kitchen and ripped the phone from the wall. She told Bransford, "And you won't be calling the cops." Bransford got up, ran out the back door, and used a neighbor's phone to call the police. As he was leaving, Velasco yelled, "Come back here."

Velasco and de la Paz got back in the white car and it drove away. Bransford returned to his residence. The television set from the spare bedroom was sitting by the back door; and the bedroom was in disarray.

Matthew Gordon, a deputy with the Riverside County Sheriff's Department, responded to Bransford's 911 call. Bransford's left ear and face were red. He had a small abrasion on his left cheek. Gordon looked inside the residence. The phone bracket was torn out of the wall. There was a television set on the stairs with de la Paz's cell phone next to it.

San Bernardino County Sheriff's Detective Luke Gaytan, who also participated in the investigation, went to Velasco's mother's house. Velasco came to the front door. He was wearing a blue bandana around his neck. De la Paz was in the garage. Gaytan searched the house. He found a loaded .25 caliber semiautomatic handgun in the laundry room. It was on a shelf with some folded clothes. He also found a notebook with Puente 13 gang writing on it. The writing indicated that Velasco was from the Ballista Street

5

Clique and that his moniker was Toker. Inside the notebook were pay/owe sheets for the sales of narcotics.

Gordon subsequently interviewed de la Paz. She told Gordon that she spent the night of November 28 at Bransford's residence. She left the next morning, returned, and then left again to get some methamphetamine. Velasco, who she called "Toker" or "Tokes," and another man, who she knew only as "Frank," took her to get the drugs. She owed Velasco $40 for the methamphetamine. When they were finished, she asked Frank to take her back to Bransford's so she could retrieve some methamphetamine and money she had left there. They got back around 4:00 p.m. Bransford, who was outside, let them in. Bransford and Velasco sat down on the couch. De la Paz went into the spare bedroom to look for her methamphetamine and money, but could not find them. Velasco started hitting Bransford with a closed fist. Velasco removed a gun from his waistband, put it to Bransford's head, and told Bransford he would "blow [his] brains out" if he did not give de la Paz her money. Velasco then asked Bransford if he had ever been pistol whipped. Bransford said "no." Velasco struck Bransford several times in the face while telling him, "You better find my fucking money." Meanwhile, at Velasco's request, de la Paz unplugged one of the phones and pulled the other from the wall, so that Bransford could not call the police. Bransford eventually ran away. While he was gone, Velasco tried to take the television set. He started to bring it outside but dropped it on the steps.

Once Bransford was gone, de la Paz left his home and went to the front of the trailer park complex, where she waited for Velasco and Frank. After Velasco and Frank

6

picked up de la Paz, they drove to Velasco's mother's house. On the ride over, Velasco laughed and told Frank he had beaten up someone over money.

During the conversation with Gordon, de la Paz said that she was a member of the 18th Street gang and that she believed Velasco was from a gang called La Puente. When Gordon asked her why she got into Frank's car after leaving Bransford's, de la Paz responded, "because us gang members stick together."

At trial, de la Paz admitted that she was a member of the Los Angeles based 18th Street gang and specifically, a clique known as the Smiley Drive Gangsters. She also acknowledged that she was currently serving a prison sentence in this same case after pleading guilty to robbery and admitting a gang allegation. She still corresponds with Velasco.

De la Paz gave a different version of the events of November 29 than the one she had provided to Gordon. She testified that the morning of November 29, after spending the night at Bransford's house, she went dumpster diving. She returned to Bransford's. Her money and drugs were gone. She asked Bransford where they were. Bransford hit her. She called Velasco and asked him to come get her. Velasco and a third person came over in a car. Bransford was outside. He yelled at Velasco, threw things at de la Paz, and told her he did not want her to spend time with another man.

Velasco stayed outside while de la Paz went into the residence and tried to take the television set from the spare bedroom. It was too heavy so she left it on the stairs. She ran to the parking lot, got in the car, and left.

7

B.  Gang Evidence

Sergeant Glen Eads of the Los Angeles County Sheriff's Department testified as an expert on the Puente 13 criminal street gang.  Puente 13 is based in Los Angeles, and started between 1950 and 1960.  In November 2010, it had about 900 members.  These members are divided into 16 cliques, one of which is "Ballista."  Its common signs or symbols include PX13, Puente LP, a bridge, Bridge Town, and the letter P.  Like all Southern California Hispanic gangs, it pays taxes to the Mexican Mafia, a prison gang.  Its rivals never included the 18th Street gang.

One of the primary purposes of Puente 13 is to commit criminal offenses.  Among the crimes committed by gang members are assault with a deadly weapon, extortion, vehicle theft, grand theft, fraud, witness intimidation, shooting at an inhabited dwelling, rape, murder, the sale of narcotics, and robbery.  Eads identified two predicate offenses.  In 2009, member Rudy Villa was convicted, in Los Angeles County Superior Court case no. KA084998, of assault with a deadly weapon.  In 2008, member Sergio Serrano was convicted, in Los Angeles County Superior Court case no. KA083899, of assault with a firearm.

Through the instant action, Eads became familiar with Velasco.  His agency issued two field identification cards to Velasco, one in January 1998 and one in May 1998.  The first listed Velasco as an associate of Puente 13; the second as a member of that gang.  Velasco had two monikers, "Toker" and "Boo Boo."

Officer Joe Scida of the Los Angeles County Police Department testified as an expert on the 18th Street gang.  The 18th Street gang is based in Los Angeles, but is

8

spread throughout the country and internationally. It has about 20,000 members. In Los Angeles County, there are 20 cliques in the gang. Its common signs or symbols include the numbers 18, 99, and 666, and the letter E. It pays taxes to the Mexican Mafia. Puente 13 is not one of its rivals.

One of the primary purposes of the 18th Street gang is to commit criminal offenses. Among the crimes committed by gang members are vandalism, armed robbery, robbery, narcotics sales, weapons violations, assault, extortion, murder, and prostitution. Scida identified two predicate offenses. In 2010, member Edward Diaz was convicted, in Los Angeles County Superior Court case no. BA372396, of possession of narcotics for sale. In 2008, member Juan Sotello was convicted, in Los Angeles County Superior Court case no. BA349874, of unlawful vehicle taking.

Gaytan also testified as a gang expert. He noted that during a contact with de la Paz, she said she was from the west side of the 18th Street gang. She also said 18th Street has thousands of members who live as far south as El Salvador. She has "WS 18 St" tattooed on the middle finger of her left hand. On April 2, 2010 and October 14, 2010, field identification cards were completed in which she admitted gang membership. Gaytan concluded de la Paz was an active participant in 18th Street based on her self-admissions, her tattoos, and her prior contacts with law enforcement.

Gaytan was present when Gordon took photographs of Velasco's tattoos. They include "LA P," "Ballista Puente," "P13," "P," a skull wearing a Pittsburgh Pirates baseball cap, a skull wearing a cap with the word "Puente" on it, "SGV," and "B St." The tattoos show that Velasco is a member of the gang and claims to be a member. When

9

Gaytan spoke to Velasco, Velasco said he was from Ballista Street and was still in good standing. Gaytan opined that Velasco was a member of Puente 13 and was actively participating in the gang. He based his opinion on Velasco's self-admission, his tattoos, the gang paraphernalia at Velasco's mother's garage, and the fact de la Paz called him "Toker" during her interview.

Gaytan explained that in Los Angeles, gangs often rival one another over territory. In the high desert area, by contrast, crimes are frequently committed by members of more than one gang working together. Gang members who would not act with each other in Los Angeles do so in the high desert because the crimes are then more lucrative.

## DISCUSSION

## I

## *STREET TERRORISM*

Velasco contends insufficient evidence supports his conviction for street terrorism (otherwise known as active street gang activity) under section 186.22, subdivision (a). Street terrorism consists of three elements: (1) participation in a street gang that is more than nominal or passive; (2) knowledge the gang's members engage in, or have engaged in, a pattern of criminal gang activity; and (3) willfully promoting, furthering, or assisting in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523.) Velasco challenges the sufficiency of the evidence on the third element, and claims there is no evidence he willfully promoted, furthered, or assisted the felonious criminal conduct of any other member of his gang.

10

In contrast, the People argue that section 186.22, subdivision (a) merely requires two gang members act together, but does not demand that they belong to the same gang. Thus, before we review the evidence adduced at trial in support of Velasco's conviction of street terrorism, we must interpret section 186.22, subdivision (a) to address the issue presented here:  Does the statute require that the defendant promote, further, or assist in any felonious criminal conduct by a member of the defendant's gang or will a gang member from another gang suffice.

The interpretation of section 186.22, subdivision (a) is a question of law that we review de novo.  (*People ex. rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)  In construing statutes, we determine and effectuate legislative intent.  (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007; *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 40.)  To ascertain intent, we look first to the words of the statutes.  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387; *Woodhead*, *supra*, at p. 1007.)  "[W]e begin with the plain, commonsense meaning of the language used by the Legislature.  [Citation.]  If the language is unambiguous, the plain meaning controls."  (*Voices of the Westlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 519.)  "Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible."  (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844.)

Section 186.22, subdivision (a), states:  "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any

11

felonious criminal conduct by members of that gang, shall be punished . . . in the state prison for 16 months, or two or three years."  As our high court noted, "[t]his statute has been the object of much appellate parsing."  (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1131 (*Rodriguez*).)  However, we are unaware of any court that has interpreted the phrase "that gang" in the statute.  Neither party has provided such authority, and our independent research uncovered none.

Here, Velasco primarily relies on *Rodriguez*, *supra*, 55 Cal.4th 1125.  In *Rodriguez*, the defendant acted alone in committing an attempted robbery.  A jury convicted him of attempted robbery and active participation in a criminal street gang under section 186.22, subdivision (a).  (*Rodriguez*, *supra*, at p. 1129.)  The issue in *Rodriguez* was whether the third element of the crime described in section 186.22, subdivision (a), willfully promoting, furthering, or assisting in any felonious criminal conduct by members of the defendant's gang, can be satisfied by felonious criminal conduct committed by the defendant acting alone.  (*Rodriguez*, *supra*, at p. 1129.)  The court held that it does not.  (*Id.* at p. 1137, fn. 8.)

The court in *Rodriguez* began by analyzing the statute according to its " 'plain, commonsense meaning.' "  (*Rodriguez*, *supra*, 55 Cal.4th at p. 1131.)  The felonious criminal conduct referred to in the statute must be committed " 'by members of that gang.' "  (*Ibid.*)  The word " '[m]embers,' " the court explained, is a plural noun.  (*Id.* at p. 1132.)  Therefore, the court reasoned "[t]he plain meaning of section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member."  (*Ibid.*)

Because the defendant acted alone, the court concluded that he did not violate section 186.22, subdivision (a). (*Rodriguez*, *supra*, at p. 1139.)

The People contend *Rodriguez* is distinguishable from the instant matter because Velasco did not act alone. They emphasize that it is undisputed that Velasco attempted to rob Bransford with the help of de la Paz. We agree with the People that *Rodriguez* is distinguishable on this point. However, we follow our high court's approach to the interpretation of section 186.22, subdivision (a) in that we analyze the statute according to its "plain, commonsense meaning." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1131.) The phrase, "that gang" refers to "gang" in the singular. The reference to gang in the singular is consistent with the first clause of subdivision (a): "Any person who actively participates in any criminal street gang." (§ 186.22, subd. (a).) Again, the Legislature referred to "gang" in the singular. There is no mention of multiple gangs. Moreover, the term "that" in section 186.22, subdivision (a) is a definite article that indicates something specific that the readers already know or have read. Here, "that" immediately precedes the term "gang." This is the same "gang" previously referenced in the first clause of section 186.22, subdivision (a). The Legislature's use of the term "that" as a definite article makes it clear that it is referring to the same gang the subdivision previously mentioned. Accordingly, based on the plain, commonsense meaning of the phrase "that gang" within the context of subdivision (a), "that gang" clearly refers back to the "gang" in which the defendant is an active participant. We see nothing in subdivision (a) or the rest of section 186.22 that supports the People's interpretation here that the phrase "that gang" applies to two separate gangs whose respective members are working together to

13

commit a felony.  If the Legislature had intended to write such a statute, it would have referred to gangs in the plural or otherwise made it explicit that the actors do not have to be members of the same gang.  It did not do so.

The People, however, ask us to look past the singular use of "gang" as well as the definite article "that" and consider the policy behind the statute.  They therefore argue the Legislature's intent in drafting subdivision (a) was to include a defendant working with a member of another gang, not only a member of the defendant's gang.  To support their argument, the People rely on section 186.21, *People v. Albillar* (2010) 51 Cal.4th 47 (*Albillar*), and *People v. Ortega* (2006) 145 Cal.App.4th 1344 (*Ortega*).  None of these authorities buttress the People's contention.

Section 186.21 sets forth the policy underlying the Street Terrorism Enforcement and Prevention (STEP) Act.  That section provides, in part:

> "The Legislature . . . further finds that the State of California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods.  These activities, both individually and collectively, present a clear and present danger to public order and safety and are not constitutionally protected.  . . .  It is the intent of the Legislature in enacting this chapter to seek the eradication of criminal activity by street gangs by focusing upon patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs."

We find nothing in section 186.21 that changes the plain meaning of the phrase "that gang" in section 186.22, subdivision (a).  The People also fail to explain how section 186.21 converts the singular "gang" to "gangs" in section 186.22, subdivision (a).  Nor do they illuminate how the use of the word "that" could refer to any gang, not just the gang

14

previously mentioned in subdivision (a). Instead, the People leap over these gaps in their proposed interpretation of the statute and seek solace in *Rodriguez*, where the Supreme Court noted "with section 186.22[,subdivision ](a), the Legislature sought to punish gang members, who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang-related." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1138.) However, as the People argue in distinguishing *Rodriguez* from the instant matter, the court there was concerned with whether a defendant acting alone could fall under section 186.22, subdivision (a). It answered that question in the negative. The court did not address whether two members of different gangs satisfied the requirements of the statute. As such, we cannot observe the distinguishing facts of *Rodriguez* on the one hand, but ignore them on the other to achieve the result urged by the People. Such an approach is not consistent with the goal of reasonable statutory interpretation.

Likewise, we are not persuaded by either *Albillar*, *supra*, 51 Cal.4th 47 or *Ortega*, *supra*, 145 Cal.App.4th 1344. *Albillar* involved a sexual assault by three men who were shown to be members of the same criminal street gang. (*Albillar*, *supra*, at p. 51.) The issue before the court concerned whether the prosecution had to demonstrate that the underlying felony was gang related. (*Id.* at pp. 55-59.) *Albillar* did not involve two individuals from different gangs committing a felony. It therefore is not instructive here.

*Ortega*, *supra*, 145 Cal.App.4th 1344 also does not help the People. In that case, three Norteño gang members worked together to commit a murder for monetary gain. The gang expert in that case testified that Norteño is a criminal street gang made up of 20 to 25 different subsets in Sacramento. (*Id*. at p. 1354.) He opined that the defendant was

15

a Norteño, specifically a Barrio North Side Norteño, and that the other two men involved in the murder were Norteños without identifying the subset or subsets to which they belonged. (*Ibid*.)  The gang expert testified that the Norteño gang's primary activities were "murder, assault, witness intimidation, car-jacking, robbery, extortion, and dope dealing."  He also testified regarding two shootings committed by Norteños, including "a shooting into a crowd of rival gangsters" and the shooting of someone who was wearing Sureño colors. (*Id*. at p. 1356.)  The court rejected the "defendant's assertion that the prosecution had to prove precisely which subset was involved" in the case. (*Id*. at pp. 1356-1357.)  The court observed that "No evidence indicated the goals and activities of a particular subset were not shared by the others.  There was sufficient evidence that Norteño was a criminal street gang, that the murder was related to activity of that gang, and defendant actively participated in that gang." (*Id*. at p. 1357.)  The court stated, "In this case there was testimony that it was not uncommon for members of different gangs to work in concert to commit a crime.  In light of the nature of gang structure and the apparent willingness of members to work with other gangs to commit crimes, requiring the prosecution to prove the specific subset of a larger gang in which a defendant operated would be an impossible, and ultimately meaningless task." (*Ibid*.)

The instant case is distinguishable from *Ortega* because here Velasco and de la Paz belong to different gangs, not subsets of the same primary gang.  Velasco is a member of Puente 13.  De la Paz is a member of 18th Street.  There was no evidence that these two gangs were subsets of the same gang.  The prosecution did offer evidence that both gangs paid taxes to the Mexican Mafia, but apparently all Hispanic gangs in

16

California do so.  The People, however, do not explain how this evidence makes Puente 13 and 18th Street the same as the various sects under Norteño as the court found in *Ortega*, *supra*, 145 Cal.App.4th 1344.  The prosecution also offered evidence that sometimes different gangs in the high desert area work together to commit crimes.  This evidence falls short of the evidence provided in *Ortega*.  Moreover, there is no evidence in the record that Puente 13 and 18th Street routinely worked together.  At best, the prosecution offered evidence that Puente 13 and 18th Street were not rivals.  This evidence simply is not enough to make the instant action analogous to *Ortega*.

In short, we interpret section 186.22, subdivision (a) as requiring the defendant to be acting with another member of the defendant's gang.  It is not sufficient that the defendant act with a member of another gang, unless it is shown that those gangs are merely subsets of a primary gang and typically work together.  In light of this interpretation, we next evaluate if sufficient evidence supports the jury's verdict as to the street terrorism offense.

The standard of review for a sufficiency of the evidence claim is well established. We review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)

17

Here, there is no evidence that Velasco committed any felonious act with another member of the criminal street gang Puente 13. Without this evidence, Velasco's conviction for street terrorism cannot stand.[4]

II

*FIRST DEGREE ROBBERY*

Velasco contends his conviction for count 1, first degree robbery, must be reduced to second degree robbery because the jury failed to specify the degree on the verdict form. We disagree.

A. Background

Section 212.5 defines the offense of robbery and states in pertinent part:

> "(a) Every robbery . . . which is perpetrated in an inhabited dwelling house . . . is robbery of the first degree.
>
> "(b) Every robbery of any person while using an automated teller machine or immediately after the person has used an automated teller machine and is in the vicinity of the automated teller machine is robbery of the first degree.

---

[4] We observe that the evidence of any gang activity in relation to the offenses charged was minimal. As we discuss above, Velasco is a member of Puente 13 and de la Paz is a member of 18th Street. De la Paz told investigators that she got in a car with Velasco "because us gang members stick together." This is not a case in which a gang expert is necessary to help the jury understand the actions of a defendant within the gang context. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 617 [observing that culture and practices of criminal street gangs are matters outside the common experience of jurors justifying expert witness testimony to explain how certain activity might be gang related].) Here, it appears that Velasco was trying to help de la Paz collect a debt. Although his tactics were unlawful, they are understandable even outside the criminal street gang context. Given the lack of evidence linking Velasco's acts with any gang or gang activity, it is not surprising the jury was not able to find that counts 1, 4, and 5 were committed for the benefit of, at the direction of, or in association with, a criminal street gang, within the meaning of section 186.22, subdivision (b)(1).

18

"(c) All kinds of robbery other than those listed in subdivisions (a) and (b) are of the second degree."

The third amended information alleged Velasco committed count 1, robbery, as follows: "On or about November 29, 2010, in the above named judicial district, the crime of ATTEMPTED HOME INVASION ROBBERY, in violation of PENAL CODE SECTION 664/211, a felony, was committed by Robert Frank Velasco, who did unlawfully and by means of force and fear attempt to take personal property from the person, possession and immediate presence of Marvin Robert Bransford and said offense was perpetrated in an inhabited dwelling house, trailer coach and inhabited portion of a building." The court read this charge, verbatim, to the jury before opening statements.

There was overwhelming evidence at trial that the robbery was attempted in the mobile home where Bransford lived.

The jury was instructed as to count 1, robbery, that the offense was divided into two degrees:

"Robbery is divided into two degrees. If you conclude that the defendant committed an attempted robbery, you must then decide the degree.

"To prove that the defendant is guilty of first degree attempted robbery, the People must prove that:

"The attempted robbery was committed in an inhabited dwelling. The dwelling is inhabited if someone lives there and either is present or has left but intends to return.

"All other robberies are of the second degree.

"The People have the burden of proving beyond a reasonable doubt that the attempted robbery was first degree rather than a lesser crime.

19

>If the People have not met this burden, you must find the defendant not guilty of first degree attempted robbery." (CALCRIM No. 1602)

For count 1, the jury was not given a verdict form for second degree attempted robbery. Instead, the jury received a single verdict as to count 1, which they returned with a guilty finding: "We, the jury . . . , find the defendant, ROBERT FRANK VELASCO, guilty of the crime of, ATTEMPTED ROBBERY in violation of Penal Code Section 664/211, as charged in Count 1 of the Information."

### B. *McDonald-Beamon*

Velasco contends that although the jury found him guilty of count 1, it never made a finding that his conviction was for attempted first degree robbery of an inhabited dwelling and the offense must be reduced to attempted second degree robbery as a matter of law. Velasco's argument is based on section 1157, which states: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

Velasco's argument is also based on the interpretation of section 1157 in *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*) and *People v. Beamon* (1973) 8 Cal.3d 625 (*Beamon*). "Under the *McDonald-Beamon* rule, a jury in a criminal case is required to determine the degree of the crime and if it does not, the offense is deemed to be of the lesser degree." (*In re Birdwell* (1996) 50 Cal.App.4th 926, 928.) "Even if it is obvious

20

that the jury intended to find [the greater degree], the *McDonald-Beamon* rule focuses solely on the actual verdict and does not take into account any extrinsic evidence or findings."  (*Id*. at p. 930.)

In *McDonald*, the defendant was charged with murder "in the usual manner, i.e., without specification of degree."  He was convicted of murder "as charged in the information," and the jury found the robbery special circumstance true.  (*McDonald*, *supra*, 37 Cal.3d at pp. 379, 381.)  The defendant argued the verdict should be fixed at second degree murder pursuant to section 1157 because the jury failed to specify the degree in its verdict.  The court agreed:  "[T]he key is not whether the 'true intent' of the jury can be gleaned from circumstances outside the verdict form itself; instead, application of [section 1157] turns only on whether the jury specified the degree in the verdict form."  (*McDonald*, *supra*, at p. 382; see *Beamon*, *supra*, 8 Cal.3d at p. 629, fn. 2.)

However, there have been limitations placed on the *McDonald-Beamon* rule. Where the verdict includes language equivalent to "first degree," the degree of the crime has been sufficiently specified.  (*People v. Preciado* (1991) 233 Cal.App.3d 1244, 1250 (*Preciado*).)  In *Preciado*, the information charged the defendant with a " 'violation of Section 459/460.1/461.1 of the Penal Code (Residential Burglary-1st Degree ).' " (*Preciado, supra,* at p. 1247, italics omitted.)  The verdict form stated the jury found the defendant guilty " 'of the crime of felony, to wit:  Violation of Section 459 of the Penal Code of the State of California, (Residential Burglary) as charged in Count 1 of the Information.' "  (*Preciado, supra*, at p. 1247, italics omitted.)

21

The court in *Preciado* held section 1157 did not require reduction of the offense to second degree burglary even though the verdict form did not state whether the jury found him guilty of first or second degree burglary: "The verdict described a first degree burglary in so many words, 'residential burglary,' and referred to the information which did specifically charge defendant with first degree burglary. There was no evidence defendant burglarized anything but an 'inhabited dwelling house' [citation]. And 'residence' and 'inhabited dwelling house' are interchangeable terms." (*Preciado*, *supra*, 233 Cal.App.3d at pp. 1247-1248, italics omitted.)

*Preciado* distinguished the *McDonald-Beamon* line of cases: "[A]pplication of the rule of *McDonald-Beamon* has been confined to those situations in which the prosecution was forced to argue from inferences based on collateral findings in circumstances where no fixing of the degree or the equivalent was made at all." (*Preciado*, *supra*, 233 Cal.App.3d at p. 1248, fn. omitted.) In contrast, *Preciado* held the case involved a situation "where the offense is unmistakably described as a crime that could only be of the first degree." (*Id*. at p. 1249.)

"[W]e agree that *McDonald* and *Beamon* are inapplicable because 'in those cases the [intended] degree of the crime was [only] implied by other subsequent findings,' the purpose of which ' "was other than to describe the degree of the crime." ' [Citation.] And such is not the case here. We are required to imply nothing. The information charged first degree residential burglary; the evidence would only support first degree burglary; and the verdict form, specifically finding burglary of a residence, was just another way of

saying first degree burglary. There is no reason to reduce the degree under these circumstances." (*Preciado, supra,* 233 Cal.App.3d at pp. 1249-1250, fn. omitted.)

In *People v. Mendoza* (2000) 23 Cal.4th 896 (*Mendoza*), our high court disapproved of the *McDonald-Beamon* rule in certain circumstances. In that case, the indictment alleged the defendants committed murder while committing robbery and burglary. The prosecution's only theory was that the defendants killed the victim while committing robbery and burglary, and the court instructed only on that theory, stating the defendants could be convicted only if the killing occurred during the commission of robbery or burglary, and the defendants had the specific intent to commit robbery or burglary. Neither the instructions nor the verdict forms gave the jurors the option to return verdicts for second degree murder or any lesser form of criminal homicide. The verdicts stated that the defendants were "guilty of the offense charged in Count I, a felony, to wit, murder in violation of Section 187(a)," and that the murder was committed while the defendants were engaged in the commission of robbery and burglary. (*Mendoza, supra,* at pp. 903, 907.)

The court rejected the defendants' argument that their convictions should be reduced from first to second degree murder, and held section 1157 was inapplicable because the defendants had not been convicted of a crime which was " 'distinguished into degrees.' " (*Mendoza*, *supra*, 23 Cal.4th at p. 910, fn. omitted.) "[T]he prosecution's only murder theory at trial" was felony murder, "which is first degree murder as a matter of law," and the jury was instructed "to return either an acquittal or a conviction of first degree murder." (*Id*. at p. 900.) The court reasoned that "the first degree felony-murder

23

rule 'is a creature of statute,' " which, by its terms, makes murder committed during robbery or burglary murder of the first degree. (*Id*. at p. 908.) "Thus, there are no degrees of such murders; as a matter of law, a conviction for a killing committed during a robbery or burglary can only be a conviction for first degree murder." (*Ibid*., italics omitted.) Consequently, in such a case "the only guilty verdict a jury may return is first degree murder." (*Ibid*., italics omitted.)

The court held "that under these circumstances, section 1157 does not apply because [the defendants were not] 'convicted of a crime . . . which is distinguished into degrees' within the meaning of that section." (*Mendoza*, *supra*, 23 Cal.4th at p. 900.) The court stressed that where a jury is instructed solely "on first degree felony murder and to find the defendant either not guilty or guilty of first degree murder," "the only crime of which a defendant may be convicted is first degree murder, and the question of degree is not before the jury." (*Id*. at p. 910, italics omitted.) In explaining its rationale, the court articulated the purpose of the degree-fixing statute "is to ensure that where a verdict other than first degree is permissible, the jury's determination of degree is clear." (*Ibid*., italics omitted.) But where a fact finder can only convict a defendant of a first degree crime, to require a reviewing court to deem the conviction to be of a lesser crime "that was never at issue" would produce "absurd and unjust results" and elevate form over substance. (*Id*. at p. 911.)

*Mendoza* partially overruled *McDonald, supra,* 37 Cal.3d 351, which had mandated that " 'the terms of the [degree-fixing statute were] unambiguous' " and were to be strictly applied without exception. (*Mendoza*, *supra*, 23 Cal.4th at p. 913.) In

24

overruling *McDonald*, the court was "mindful that [the] Courts of Appeal have been critical of *McDonald* and have adhered to it only grudgingly." (*Mendoza*, *supra,* at p. 923.)

## C. Analysis

There was no question from the trial evidence in this case that the robbery was attempted in an inhabited dwelling. However, section 1157 and the *McDonald-Beamon* rule focuses on whether the jury failed to specify the degree of the crime in the actual verdict form, and not on circumstances outside the verdict form itself. (*McDonald*, *supra*, 37 Cal.3d at p. 382.)

The instant case is similar to the circumstances in *Preciado, supra,* 233 Cal.App.3d 1244, because the verdict form for count 1 specifically referenced the information and the jury was only given the option to find Velasco guilty or not guilty of attempted first degree robbery as set forth in the indictment. As explained above, the third amended information charged in count 1 that Velasco "did unlawfully and by means of force and fear attempt to take personal property from the person, possession and immediate presence of Marvin Robert Bransford and said offense was perpetrated in an inhabited dwelling house, trailer coach and inhabited portion of a building." The instructions further defined first degree robbery as charged in count 1 as a robbery that occurs in an inhabited dwelling house, all other robberies were second degree, and the People had the burden of proving the robbery "was first degree rather than a lesser crime.

If the People have not met this burden, you must find the defendant not guilty of first degree robbery."[5]  (CALCRIM No. 1602.)

While the instructions defined all other robberies as second degree, the verdict form gave the jury only one choice:  Velasco was either guilty or not guilty in count 1 of the crime of, "ATTEMPTED ROBBERY in violation of Penal Code Section 664/211, as charged in Count 1 of the Information."  The jury did not have an option to convict Velasco of anything less that attempted first degree robbery.  The jury was instructed that the prosecution had the burden of proving the crime was first degree robbery of an inhabited dwelling.

Velasco points out that the verdict form and the jury instructions focus on the crime of attempted robbery while the information lists count 1 as attempted home invasion robbery.  Based on this distinction, Velasco argues this court cannot find the jury intended to convict Velasco of attempted robbery in the first degree.  We are not persuaded.

Velasco has not pointed us to any authority that states there is a distinction between attempted home invasion robbery and attempted robbery in the first degree.

<hr />

[5]     On the record before us, it appears the fact the jury was given an instruction that mentioned second degree robbery was a function of providing the standard robbery jury instruction only.  There is no indication that Velasco ever challenged the fact that the attempted robbery took place in an inhabited dwelling.  Indeed, based on the evidence at trial and the respective closing arguments, this fact was all but stipulated to.  In this sense, the instant case is similar to both *Preciado*, *supra*, 233 Cal.App.3d 1244 and *Mendoza*, *supra*, 23 Cal.4th 896 as it was clear here that the prosecution presented the theory that Velasco could be convicted of attempted first degree robbery or nothing at all in regard to count 1.

These offenses are the same. Both involve the attempt to take personal property from a person by means of force and fear with the offense occurring in an inhabited dwelling house, trailer coach, or inhabited portion of a building. Indeed, the information's reference to attempted home invasion robbery only underscores the fact that Velasco was being charged with attempted first degree robbery. The court read the information to the jury. The verdict form given to the jury specifically referenced count 1 of the information. As such, there is no confusion or prejudice caused by the court and jury instructions referring to count 1 as attempted robbery and the information stating it was attempted home invasion robbery.

As the jury unmistakably expressed its intent to convict Velasco of first degree attempted robbery by finding him guilty as charged in the information, the evidence did not support a lesser charge, and the defect in the verdict form did not prejudice Velasco, we decline to reduce the degree of Velasco's crime for count 1. (See, e.g., *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272 [" ' "The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed." ' "]; *People v. Jones* (1997) 58 Cal.App.4th 693, 710-711 [" 'Technical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice.' "].)

III

*SECTION 654*

The trial court sentenced Velasco to prison for 28 years eight months. This sentence included a consecutive term of two years on count 4 (assault with a firearm),

27

plus three years four months on the gun enhancement allegation accompanying count 4. Velasco contends, under section 654, the trial court should have stayed his sentence on the assault charge and its attendant enhancement, because the crime was merely incidental to count 1, the attempted robbery. We disagree.

Section 654 bars multiple punishments of a single, physical act or omission. Fifty-four years ago, however, in *Neal v. State of California* (1960) 55 Cal.2d 11 (*Neal*), disapproved on a different point in *People v. Correa* (2012) 54 Cal.4th 331, 334 (*Correa*), our Supreme Court substantially enlarged the statute's scope. The court, recognizing that few crimes result from a single physical act, adopted a test focusing on whether the defendant engaged in an indivisible course of conduct pursuant to a single intent and objective. (*Neal*, *supra*, at p. 19.) In applying this test, the court inquired whether all of the crimes were incident to one objective (*ibid*.) and whether one crime served as the means of perpetrating another crime (*id*. at p. 20).

Over 30 years later, in *People v. Latimer* (1993) 5 Cal.4th 1203, our Supreme Court criticized the *Neal* test as a " 'judicial gloss' . . . 'engrafted onto section 654' " that can defeat the statute's purpose of matching punishment with culpability. (*Latimer*, *supra*, at p. 1211.) Nonetheless, the court in *Latimer* declined to overrule the *Neal* test because, over the course of three decades at that point, the Legislature had incorporated the *Neal* rule into California's sentencing scheme. (*Latimer*, *supra*, at p. 1205.) In *Latimer*, the court "stressed, however, that 'nothing we say in this opinion is intended to cast doubt on any of the later judicial limitations of the *Neal* rule.' " (*Correa*, *supra*, 54 Cal.4th at p. 336.) Recently, our Supreme Court placed another judicial limitation on

28

the *Neal* rule (*Correa*, *supra*, at p. 344) after recognizing that the *Neal* test "has been a subject of continuing controversy and given rise to much confusion" (*Correa*, *supra*, at p. 335).[6]

These judicial limitations--intended to better correlate punishment with culpability--have narrowed the application of *Neal's* single intent and objective test. (*Correa*, *supra*, 54 Cal.4th at p. 341.) Of these limitations, the following ones are relevant here. First, courts avoid viewing a defendant's intent or objective too broadly or amorphously. (*People v. Perez* (1979) 23 Cal.3d 545, 552; *People v. Morelos* (2008) 168 Cal.App.4th 758, 769.) Second, courts have recognized the need for flexibility in applying the rule on a case by case basis: "[T]here can be no universal construction which directs the proper application of section 654 in every instance." (*People v. Beamon* (1973) 8 Cal.3d 625, 636.) "Notwithstanding the apparent simplicity of its language, the applicability of section 654 in a particular case often involves a difficult analytical problem. [Citation.] Each case must be determined on the basis of its own facts, and general principles applicable to one type of case may not apply to another." (*In re Adams* (1975) 14 Cal.3d 629, 633; see also 3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Punishment, § 248, pp. 397-399.)

" 'The defendant's intent and objective are factual questions for the trial court' " (*People v. Coleman* (1989) 48 Cal.3d 112, 162), "which is vested with broad latitude in

---

6    In *Correa*, the court rejected dictum in a *Neal* footnote and concluded "section 654 does not bar multiple punishment for violations of the same provision of law." (*Correa*, *supra*, 54 Cal.4th at p. 344.)

making its determination" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143). When a trial court sentences a defendant for two crimes, without suspending execution of sentence, the judge implicitly finds the acts involved more than one objective. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) The court's findings (express or implied) are subject to the substantial evidence standard of review. (*Coleman*, *supra*, at p. 162.) We review for substantial evidentiary support the court's implied findings that neither of defendant's crimes was incidental to the other or the means by which the other crime was accomplished, and that defendant harbored separate intents. (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.) We view the record in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the court could reasonably deduce from the evidence. (*Ibid*.)

Acts of gratuitous violence against a helpless, unresisting victim are not incidental to robbery for purposes of section 654. (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 190-193; accord, *People v. Saffle* (1992) 4 Cal.App.4th 434, 437-440 [separate punishment appropriate for false imprisonment committed immediately after sex offenses were complete, facts supported finding that defendant had separate intent of dissuading victim from reporting incident].)

Here, Bransford testified that after he entered his residence and sat down on the couch, de la Paz accused him of taking her drugs and $40 in cash. Bransford told de la Paz and Velasco that he had no idea what they were talking about. Velasco pulled out a gun and asked Bransford, "Have you ever been pistol whipped?" Bransford said he had not. As Bransford sat on the couch, Velasco struck him three or four times in the

30

face and in the head with the gun. Velasco said, "You have to have her $40." When Bransford protested, Velasco struck him three or four more times.

De la Paz told Gordon that after she searched the spare bedroom for drugs and money, Velasco started hitting Bransford with a closed fist. Velasco removed a gun from his rear waistband, pointed it at Bransford's head, and said he would "blow [his] brains out" if Bransford did not give de la Paz her money back. Velasco asked Bransford if he had ever been pistol whipped, said, "You better find my fucking money," and struck Bransford several times in the face. Under either version of events, we conclude that Velasco's conduct went well beyond that necessary to commit a robbery. He could have accomplished his objective merely by pointing the gun at Bransford's head or otherwise threatening him. Instead, he repeatedly struck Bransford with his gun and possibly his fist. On the record before us, we are satisfied that consecutive sentences were properly imposed.

Because we conclude substantial evidence does not support Velasco's conviction for street terrorism (count 5), we do not reach Velasco's argument that his sentence under count 5 should be stayed per section 654.

31

DISPOSITION

We reverse Velasco's conviction under count 5 and vacate his sentence as to count 5.  We otherwise affirm the judgment.  We remand this matter to the superior court for further proceedings consistent with this opinion.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.