Filed 9/15/16  P. v. Taylor CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>RICHARD JAMES TAYLOR,<br><br>　　　Defendant and Appellant. | B254821<br><br>(Los Angeles County<br>Super. Ct. No. VA132519) |

　　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Yvonne T. Sanchez and John A. Torribio, Judges.  Affirmed.

　　　　　Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Joseph P. Lee and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Richard James Taylor appeals from the judgment after a jury convicted him of one count of battery with serious bodily injury (Pen. Code § 243, subd. (d))[1] with a related gang enhancement (§ 186.22, subd. (b)(1)(A)), one count of pimping (§ 266h, subd. (a)) with a related gang enhancement (§ 186.22, subd. (b)(1)(A)), and one count of active participation in a criminal street gang (§ 186.22, subd. (a)). He argues that the trial court violated his Sixth Amendment right to counsel of choice or that he received ineffective assistance of counsel when his lawyers failed to preserve his right to counsel of choice; the court erred in admitting evidence from police interviews of witnesses and a search of Taylor's cell phone; the court erred by failing to give certain jury instructions; there was insufficient evidence to support the convictions for battery and active participation in a criminal street gang; the court committed multiple sentencing errors; and cumulative error requires reversal of his convictions. We conclude that the court's only errors, admitting certain hearsay evidence from two police interviews and four text-message exchanges from Taylor's cell phone, were harmless. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Marsadais Daise and the Events of February 7, 2013*

Marsadais Daise, a prostitute, had been dating Taylor, her pimp, intermittently for approximately three years. On February 7, 2013 Taylor was at a motel with Daise and two other women—Cynthia Bowen and Bowen's friend. After finding a condom in the toilet of the motel room, Daise confronted Taylor. Daise and Taylor argued. When law enforcement arrived at the motel, Daise had a bloody lip, a big lump over her eye, and a chipped tooth. She told a deputy sheriff that Taylor hit her "several times in the face with his fists," causing her injuries. She also told the deputy that Taylor was her pimp and that

---

[1]    Undesignated statutory references are to the Penal Code.

2

she gave him the money she made working as a prostitute. The deputy sheriff placed Taylor under arrest.

B.     *Jessica Sisneros and the Events of March 27-28, 2013*

At 11:00 p.m. on March 27, 2013 Jessica Sisneros was standing outside a fast-food restaurant waiting for her friend to pick her up when Taylor, driving a white van, stopped and asked if she needed a ride. Sisneros said "no," but Taylor told her to "get in the car or else I'll get you in the car." Sisneros, afraid that Taylor would hurt her, complied. Two women were already in the van. For the next seven and a half hours Taylor tried to convince Sisneros to work for him as a prostitute.

Taylor drove to a truck stop and told one of the two woman already in the van "to go one direction" and the other woman "to go to the other direction." He told them to "prostitute theirself," and said he would call them when he was ready to pick them up. Sisneros testified that the women "got out and did what he asked them to do," and that she saw them walk in different directions.

Once Sisneros and Taylor were alone in the van, Taylor said "You're gonna work for me." Sisneros said "No," and Taylor tried to slap her, but she moved away from him and closer to the passenger door. Taylor continued: "I'm a pimp. You're gonna work for me." Sisneros said, "'No, I'm not." Undeterred, Taylor said again that Sisneros would work for him, explaining that he had always wanted a "Mexican girl" to work for him. Taylor stopped the van and said, "If you want to get out, then get out." Sisneros got out of the van, but Taylor, still driving the van, tried to run her over. Sisneros jumped out of the way to avoid being hit. At that point, with "nowhere to run," Sisneros got back into the van.

At approximately 3:00 or 4:00 a.m., Taylor called the women he had dropped off earlier and arranged to meet them at a doughnut shop in Compton. The same two women, along with a third woman, got into the van. Taylor drove to a house where he got out of the car and exchanged something with Johnny "Poodah" Randall. The police arrived soon after, between 6:30 and 7:00 a.m. The police officers said that the van was

3

stolen, and arrested both men (Taylor and Randall) and all four women (Sisneros, Shambray Harper, Shaquinta "Shauna" Rembert, and Cynthia Bowen's sister, Lexy Bowen).

Detective Cynthia Sanchez interviewed Taylor. Taylor admitted that he was a member of the Elm Street gang and went by "T-Money" and "Active." Deputy Sheriff Tifani Stonich interviewed the women who were arrested. Harper told Deputy Stonich that Harper had "been a prostitute for some time," was "currently in a relationship with Active," had "been prostituting for him," and knew two of the other women who had been in the van. Harper, Rembert, Bowen, and Sisneros also made written statements, although only Sisneros's written statement was admitted at trial. The court excluded Harper's statement as more prejudicial than probative. Although Harper's statement is not included in the record, the trial judge described the statement as including information about "other girls giving money," presumably to Taylor or Randall, and "a lot of [other] stuff" "beyond what is necessary" to establish that Harper worked as a prostitute for Taylor. Counsel for Taylor questioned Deputy Stonich about Rembert and Bowen's written statements, which, although the prosecution never introduced them into evidence, apparently included information about Rembert and Bowen working as prostitutes for Randall and giving money to Randall.

The police confiscated all of the personal property that Taylor, Randall, Sisneros, Harper, Rembert, and Lexy Bowen were carrying, including their cell phones and cash. Taylor had each woman's phone number in his phone except Sisneros's. The police took screenshots of four text-message exchanges from Taylor's phone. In the first text-message exchange, Harper texted Taylor that she told someone else that she "had a pimp," and that she was "all for yu [Taylor]," "tired of hiding it," and "too loyal to hide yu." In the second text-message exchange, Rembert texted Taylor, "I promise to never do that again DADDY PLEASE AKTIVE MODEL BYTCH$$$$." The third and fourth text-message exchanges were between Lexy Bowen and Taylor. Lexy Bowen wrote, "[I] aint caught no date but im goin to get one dont trip i already gave you 120 i need 7 more . . . [h]undred to go . . . [c]ause i know how you are and i know what the results is."

4

C.    *Daise's Detention and the Preliminary Hearing*

Daise was in custody for Taylor's preliminary hearing and trial.  Although it is not entirely clear why she was in custody, the record suggests that the People had subpoenaed her in connection with Taylor's case, perhaps an earlier filing (there is a reference that this case was a re-filing of a previous case), and she had not appeared.[2] There is no evidence or suggestion that Daise was in custody pending the trial of any charges against her.  In any event, Daise was in custody for three months, until she testified at Taylor's trial.

At Taylor's preliminary hearing, Daise denied much of what she had told the deputy on February 7, 2013.  She said she had been dating Taylor "off and on for about three years," saw Taylor on February 7, 2013, was a prostitute at that time, but did not have a pimp.  She testified that she did not remember talking to law enforcement that day.  When asked how she got the lump over her eye, she answered, "I had got into a fight earlier that day with a female and I guess she hit me."  Daise stated that she argued with Taylor about the condom she found in the toilet, thought it meant that he was cheating on her, and was very angry about it—maybe angry enough to lie to law enforcement about Taylor.

D.    *The Attempt by Taylor's Family To Retain a Private Attorney To Replace Taylor's Court-Appointed Attorney*

The trial was scheduled to begin on January 30, 2014, which was day 57 of 60. Taylor was represented by court-appointed counsel, and Daise was still in custody.  The day before trial was scheduled to begin, Brenda Vargas, an attorney hired by Taylor's family, filed a motion to continue the trial so that she could substitute in as counsel and have time to prepare for trial.  In her declaration, Vargas wrote, "Our office is requesting a short continuance to allow the defendant time to examine documentary evidence, to wit,

---

[2]    The record does not indicate when Daise failed to appear.

police reports, pictures, statements and any other recordings." Vargas requested a continuance to "the middle of October, 2013," probably meaning October 2014.

On January 30, 2014, while Taylor was not in the courtroom but still represented by court-appointed counsel, Vargas came to court for the hearing on her motion. After an off-the-record discussion at sidebar about the motion, the court stated on the record: "Earlier this morning counsel Brenda Vargas had filed a request to become counsel of record and continue trial but since then counsel has withdrawn the motion and left the courthouse. So we're back with [court-appointed counsel] and the People are present." With Taylor still not present in the courtroom, the prosecutor and Taylor's court-appointed counsel announced they were ready for trial. The court ordered a panel of jurors, and the case was transferred to a different judge with the trial to begin the following day.

E.    *The Evidence Code Section 402 Hearing*

At a hearing pursuant to Evidence Code section 402, Taylor objected to Deputy Stonich's testimony about her interview with Harper, and to the introduction of Harper's written statement. Counsel for Taylor "object[ed] to the introduction of those statements on Sixth Amendment grounds" because he would have not have an opportunity to cross-examine Harper. The trial court ruled that the People could not introduce Harper's written statement, which the court described as "more inclusive" than her oral statements to Deputy Stonich, because the written statement was more prejudicial than probative. Overruling Taylor's Sixth Amendment objection, however, the court ruled that Deputy Stonich's testimony regarding Harper's statements to her was admissible. The court explained, "[Harper] saying [to Deputy Stonich], 'I'm working for Active,' meets the People's burden [on the pimping count] . . . for establishing, first of all, who [Harper] is, that is admissible against her. So I would allow it for that basis." In other words, it appears the court reasoned that, because Harper's statements would be admissible against Harper, they were also admissible against Taylor.

6

F.    *The Trial*

On the battery count, Deputy Robert Lloyd testified that he spoke with Daise at the motel on February 7, 2013.  Daise told him that Taylor hit her several times in the face with his fists, causing the lump over her eye and the cuts to her lip, and she showed Deputy Lloyd a tooth she said broke when Taylor hit her.  Daise also told Deputy Lloyd that Taylor was her pimp, and "that she has sex with people for money and she gives [Taylor] the proceeds."  Daise, still in custody, testified that, although she and Taylor had been dating and she found a condom in the toilet of his motel room, she did not believe he had had sex with either of the two other women she saw with him in the room, he was not her pimp, and he did not hit her.  After she finished testifying, the trial court asked, "Is this [her testimony] the only reason for detention in this case?"  The prosecutor answered, "Yeah," and the court released her.

On the pimping count, in addition to Deputy Lloyd's testimony that Daise said Taylor was her pimp and that she gave the money she made as a prostitute to Taylor, Sisneros testified about the events of March 27 and 28, 2013.  In particular, she testified about how Taylor dropped the two women off at the truck stop, told them to work as prostitutes, and picked them up several hours later.  Sisneros also related how Taylor told her he was a pimp, and tried to convince her to work for him.

Deputy Stonich testified about Lexy Bowen's statements that she was a prostitute, had been working for Taylor for a month, and gave all of her money either to Taylor or his "pimp partner," Randall.  Taylor did not object to the admission of this testimony.  In fact, to support Taylor's theory that Randall (not Taylor) was Bowen's pimp, counsel for Taylor elicited on cross-examination additional testimony about what Lexy Bowen told Deputy Stonich and wrote in her written statement.  Counsel for Taylor also asked Deputy Stonich about what Rembert wrote in her written statement about Randall being her pimp.  Only on redirect examination did the People elicit the testimony that was the subject of the Evidence Code section 402 hearing about Harper's statements to Deputy Stonich that Harper was working as a prostitute, "Active" was her pimp, and she gave her money to "Active."

7

The People also introduced the four text-message exchanges captured on Taylor's cell phone. Counsel for Taylor objected "on the grounds of foundation, hearsay, and 352," and "a Sixth Amendment objection . . . [t]o the extent [the text-messages] might be testimonial in nature." Taylor did not make a Fourth Amendment objection. The court overruled Taylor's objections.

On the active participation in a criminal street gang count and the gang enhancement, Detective Cynthia Sanchez testified that Taylor admitted he was a member of the Elm Street gang, and Detective Richard Sanchez, a gang expert, testified that the Elm Street gang's pattern of criminal activity included prostitution and "terroriz[ing] the neighborhood." Detective Sanchez explained that the gang commits crimes that "run the whole gamut from the pettiest crimes to the most serious, which is murder." Detective Sanchez also identified two members of the Elm Street gang who had been convicted of felonies.

Detective Sanchez further testified that "in the gang there are certain individuals that work in conjunction with one another. They call [them] pimps. . . . I get money from [a] certain amount of girls, he gets money from a certain amount of girls, the girls keep a certain percentage. . . . We're business partners. We take that money, and we make sure that everybody else in the gang is profiting from it, whether they are incarcerated or out in the street. As gang members, they make the money." Detective Sanchez explained how pimps use violence to avoid "getting in trouble." "[T]he violence that a daddy or pimp has, the mentality is like going into the military. You inflict fear the first time into someone, and for the rest of the time that person will be scared of you, and that is how a pimp thinks. They'll get a female, they'll inflict so much fear into that girl, she will lie for the pimp, she will do whatever she can to not get that pimp in trouble because she knows the repercussions of getting that pimp in trouble." "There's an old saying," explained the gang expert, "My pimp hand is hard, meaning I hit hard with my pimp hand." "You get out of line, I'm breaking out my pimp hand and make sure you get taken care of by beating, torturing them, inflicting fear for them to get back on track . . . ." In addition to protecting the pimp from "trouble," if a pimp is "soft" the

8

women who work for him will "pinch money off the top because they know the pimp hand is not hard enough, so they don't fear the pimp that much."[3]

To support Taylor's theory that Randall (but not Taylor) was a pimp, Taylor presented evidence, through the testimony of Detective Sanchez, that Randall had over $2,000 when arrested, while Taylor had only $300. Taylor also told Detective Sanchez that for the past three years he had been working at a car wash that paid him in cash "under the table."

During the People's closing argument, the prosecutor explained that the jury should apply the "facts to the law." To illustrate this point, he asked the jury to suppose that there is a "crime [that] says that the D.A. in his closing argument can't address the jury unless he's properly attired." The prosecutor then took off his jacket, tie, shoes, pants, and shirt, so that, in the courtroom, he was wearing only gym clothes. The prosecutor argued that, if the only evidence were the court reporter's testimony that he took off his clothes and a stipulation that he was a deputy district attorney at the time, the jury could not convict, because there would be no evidence that he took off his clothes during closing argument.

Also during closing argument, the prosecutor argued that Taylor was guilty of pimping because Sisneros is a "Mexican prostitute" and she testified that at one point Taylor threatened her into giving him $40. Referencing Sisneros's testimony that Taylor told her that if she did not give him her money he would throw her out of the van naked, the prosecutor emphasized that Taylor's statement was a threat: "It's not like anyone wants to be forced to be somewhere naked." The prosecutor continued, "Well, maybe if

---

[3] Detective Sanchez also testified, over Taylor's hearsay objection, that Taylor sent money to "another pimp [who is] working with him [and who is] incarcerated." On cross-examination, Detective Sanchez clarified: "[B]ased on . . . witness statements that I read, . . . [Taylor has] received money and not only given it to other people, but he's sending the money up to someone that's incarcerated based on what the victims and witnesses have said." Taylor does not argue that the court erred in admitting this testimony.

you're like Justin Bieber and you want to show . . . off your little micro penis or something, maybe that's a little different story."

Finally, in his rebuttal argument, the prosecutor told the jury that he had "started working on a song," which he shared with the jury:

"The defendant was slippin' in the Windstar,

"He didn't get very far,

"'Cause the PoPo took his ho,

"Now he can't pimp no mo.'"

Counsel for Taylor did not object during the prosecutor's closing argument. Instead, during his closing argument, counsel for Taylor argued that, "since a little bit of theater is the order of the day," the jury should "treat this as a mystery and call it Indiana Jones and the Mystery of the Pimp Ride." Counsel for Taylor urged the jury to consider that Taylor had a history of dating a prostitute (Daise), and that maybe he picked up Sisneros in an effort to date her too, because he "want[ed] her as a girlfriend." According to counsel for Taylor, "the bottom line in this case is you either believe [Sisneros's] story, or you don't. And . . . you either believe [Daise] and find [Taylor] not guilty, or you believe the prosecution when they call her a liar and find him guilty."

G.    *Verdict and Sentencing*

The jury found Taylor guilty on all three counts, and found true the gang allegations. Taylor moved for a new trial on the grounds that "[t]he prosecutor . . . engaged in a breach of decorum by partially disrobing during closing argument, which disrupted justice, interfered with the fairness of the trial, and denied [Taylor] due process." In denying the motion, the trial court stated that, although "the thrust of the motion is that [the prosecutor disrobing] reduced the trial to a farce," the court concluded "[i]t wasn't a strip show so much as [the prosecutor] was trying to make a point."

10

In a bifurcated trial, the court found true the allegations that Taylor had suffered a prior serious or violent felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12), a prior serious felony conviction within the meaning of section 667, subdivision (a)(1), and had served a prior prison term for a felony within the meaning of section 667.5, subdivision (b). The court sentenced Taylor to an aggregate prison term of 23 years, consisting of 12 years for the pimping conviction (the upper term of six years, doubled under the three strikes law), plus four years for the gang enhancement and five years for the prior serious felony conviction, and two years for the battery conviction (one-third the middle term of three years, doubled under the three strikes law). The court imposed and stayed pursuant to section 654 the sentence for Taylor's conviction for active participation in a criminal street gang and the prior prison term enhancement. Taylor filed a timely notice of appeal.

## DISCUSSION

A.    *The Trial Court Did Not Violate Taylor's Right to Counsel of Choice*

1.    *Relevant Proceedings*

Taylor argues that the trial court violated his constitutional right to counsel of choice when the court suggested, in an off-the-record sidebar conference, that it would not grant a continuance to allow his newly-retained attorney, Vargas, to prepare for trial. There was no record of what happened at the sidebar conference except the court's statement, when the case was called later that morning, that Vargas had "withdrawn the motion [for a continuance] and left the courthouse." As a result, we ordered appellate counsel for Taylor to serve and file in the superior court an application for permission to prepare a settled statement under California Rules of Court, rule 8.346. (See *People v. Taylor* (2010) 48 Cal.4th 574, 660 ["the procedures for using settled statements are used to fill in the gaps and the resulting record is 'adequate to permit meaningful appellate review'"].)

11

The trial court held two hearings to discuss the settled statement. At the first hearing, the court explained: "I am standing at sidebar is my only recollection . . . when Ms. Vargas walks over and says something about she wants to substitute in. I said it is untimely. We are ready to go. If you are ready to go, we can do it. When I call the case, she is gone . . . . She withdrew the motion, that's what happened." Later during the same hearing, the court addressed Vargas: "You came over to sidebar, made some inquiry. I told you -- I don't recall what I told you because we were at sidebar. It was not the hearing but to the effect that I had a witness in custody, everybody is ready to go, you can substitute in if you are ready, and when I called the case you were gone." Vargas explained, "I believe from my impression at sidebar, that Your Honor, you were going to deny the motion." The court added, "Should you raise the motion." Vargas agreed, "Should I raise the motion. So I went outside and I spoke with the family, and I made the indication to them that look, defense counsel is going to say that they are ready, the D.A. is going to object if I make a motion. . . . And I told the family, 'What would you like me to do? . . . And I told [Taylor's wife or girlfriend], 'From what the circumstances are, I really don't believe I am going to be allowed to be substituted in.'. . . Then the family told me, 'Well, we will go to trial.'. . . [Taylor's court-appointed counsel] indicated to me that he was ready to go to trial. . . . And I said, 'Well, if that's your indication, I will just politely bow out.' And then I met with the family afterward and I did give a refund." After the hearing, appellate counsel for Taylor prepared a draft settled statement.

At the second hearing, the court took issue with a line in the draft settled statement: "[I]t says on Page 3, Line 15, 'Judge Sanchez informed Ms. Vargas if she made the motion, the court would deny it and would allow Ms. Vargas to substitute in only if she was ready to go to trial. That's not true. I would not be inclined or my tentative is not to grant it, but I never ruled. . . . [T]here was no ruling at sidebar. . . . It wasn't fleshed out, argument wasn't fleshed out. . . . [M]y only problem [with the draft settled statement] is that [it states] I indicated . . . that I would deny [the motion.] No . . . I would have to have a fully fleshed out argument, which we never did." On

12

April 1, 2016 appellate counsel for Taylor and the prosecutor who represented the People at trial stipulated to a settled statement, which they filed in the superior court.

The settled statement states in pertinent part: "Ms. Vargas requested a sidebar and discussed the case off-the-record with Judge Sanchez. . . . [¶] During the sidebar discussions[,] Ms. Vargas informed Judge Sanchez that she had been retained by Mr. Taylor's family as his attorney, that she wanted to substitute in as counsel for Mr. Taylor and that she would need a continuance in order to prepare for Mr. Taylor's trial. . . . [¶] Judge Sanchez told Ms. Vargas that her motion was untimely and that a witness was in custody. Judge Sanchez informed Ms. Vargas that the court's tentative ruling would be to deny the motion and that Ms. Vargas would be allowed to substitute in only if she was ready to go to trial. It is Judge Sanchez's custom and practice to issue formal rulings on the record, especially in instances where a written motion has been filed. . . . [¶] Ms. Vargas withdrew her motion before it was called for a hearing and left the courtroom."

### 2. *The Trial Court Did Not Violate Taylor's Right to Counsel of Choice by Not Ruling on a Motion That Retained Counsel Withdrew*

A defendant who does not require a court-appointed attorney has the right under the Sixth Amendment to choose "counsel he believes to be best." (*U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 146.) "[T]he constitutional right at issue here is fundamental: '[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire.'" (*Luis v. U.S.* (2016) 136 S.Ct. 1083, 1089.) "[T]he right to counsel guarantees defendants 'a *fair opportunity* to secure counsel of [their] choice.'" (*Id.* at p. 1102; see *People v. Keshishian* (2008) 162 Cal.App.4th 425, 428.) In addition, because newly-retained counsel may need "some time to prepare the defense," the "simple device of denying a continuance" can deny a defendant the right to counsel of choice. (*People v. Courts* (1985) 37 Cal.3d 784, 794, fn. 8.) The right to counsel of choice, however, is not absolute, and "the court should 'balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.' [Citation] In so doing, the court

13

'must exercise its discretion reasonably: "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."'" (*People v. Keshishian, supra,* 162 Cal.App.4th at p. 429; see *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1411 ["'[a] criminal defendant's right to decide how to defend himself should be respected unless it will result in "significant prejudice" to the defendant or in a "disruption of the orderly processes of justice unreasonable under the circumstances of the particular case"'"].)

Because "the right at stake here is the right to counsel of choice, not the right to a fair trial," a violation is "complete" when a court erroneously denies the defendant the right to be represented by counsel of choice; "[n]o additional showing of prejudice is required." (*U.S. v. Gonzalez-Lopez*, *supra*, 548 U.S. at p. 146; *People v. Dowdell*, *supra*, 227 Cal.App.4th at p. 1411.) When there is an erroneous denial of a defendant's right to counsel of choice, we must reverse. (*People v. Dowdell, supra*, at p. 1411.)

As noted, the settled statement suggests that the trial court told Vargas it was inclined to deny the request for a trial continuance because the court considered the motion untimely and because a trial witness, Daise, was in custody for some unspecified reason waiting to testify in Taylor's trial. Both reasons are questionable. Taylor had not delayed the trial by making multiple requests for continuances; Vargas's request for a trial continuance was Taylor's first. There is also no evidence that Taylor was impeding the trial through intentional delay. Thus, a short continuance may have been appropriate.

The fact that Daise was in custody is troubling. It is unlawful to detain a domestic violence victim in order to secure his or her testimony. Code of Civil Procedure section 1219, subdivision (b), provides, "Notwithstanding any other law, a court shall not imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime." Under Family Code section 6211, subdivision (c), a victim of domestic violence includes a "person with whom the respondent is having or has had a dating or engagement relationship," which describes Daise. Daise testified that she and Taylor had "dated off and on for about three years,"

14

and it was undisputed that Daise and Taylor argued because Daise confronted Taylor with her suspicions about his infidelity.[4] Daise was in custody because she failed to comply with a subpoena to testify, and the court released her after her testimony. Therefore, it appears that Daise was the victim of a domestic violence crime who was "place[d] in custody . . . [for] refusing to testify concerning that . . . domestic violence crime." (Code Civ. Proc., § 1219, subd. (b).) Thus, the fact that Daise was in custody was not a reason not to continue the trial because Daise should not have been in custody. And, in any event, had the court heard Vargas's motion for a continuance, the court could have considered whether, as Taylor now argues, "[a]n electronic ankle brace could have been [used] to guarantee that [Daise] would not 'disappear.'"

Nevertheless, we cannot now determine whether the court abused its discretion in balancing Taylor's right to counsel of choice against the disruption or delay a continuance would have caused because Vargas withdrew the motion and the court never ruled on it. Therefore, there is no ruling for us to review. Taylor's unsupported assertions that it would have been futile for Vargas to "object" to the tentative ruling, presumably by arguing her motion instead of withdrawing it, and that "by withdrawing the motion . . . the court's tentative ruling became final," are incorrect. Although the circumstances surrounding the withdrawal of the motion suggest that the court may have invited or even suggested that Vargas might as well withdraw the motion so that the court would not have to deny it, we cannot say on this record that it was futile to maintain the motion or that the court actually issued a tentative ruling that it later adopted as its final ruling. The trial court did not deny Taylor the counsel of his choice.

Taylor also argues he "had the right to be physically present at the counsel-of-choice/continuance hearing based on Penal Code section 977, article I, section 15 of the California Constitution, and the Sixth and Fourteenth Amendments of the United States Constitution," and that Taylor's "absence from the counsel-of-choice/continuance

---

[4]    In fact, the trial judge asked prospective jurors whether they, or any of their friends or relatives, had been victims of domestic violence.

15

hearing requires reversal of all convictions." According to the settled statement, however, there was no such hearing for Taylor to attend. Vargas withdrew the motion.

B. *Taylor's Ineffective Assistance of Counsel Argument Fails Because He Cannot Show Prejudice*

Taylor argues that both his retained counsel, Vargas, and his court-appointed counsel "rendered ineffective assistance of counsel during the counsel-of-choice/continuance hearing, thereby requiring reversal of all convictions." Unlike the denial of a defendant's right to counsel of choice, which requires reversal, the denial of effective assistance of counsel "generally requires a defendant to establish prejudice." (*U.S. v. Gonzalez-Lopez*, *supra*, 548 U.S. at p. 146; see *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.) To show ineffective assistance of counsel, "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); see *People v. Hernandez, supra*, at p. 1105.) A defendant shows prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, at p. 694.) "This second part of the *Strickland* test 'is not solely one of outcome determination. Instead, the question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."'" (*In re Hardy* (2007) 41 Cal.4th 977, 1018.) "In demonstrating prejudice, the appellant 'must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.'"

16

(*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147; see *In re Cox* (2003) 30 Cal.4th 974, 1016.)

Taylor argues his court-appointed counsel was ineffective for failing to demand Taylor's presence during the "discussion" regarding Vargas's effort to substitute in as his attorney and obtain a trial continuance. Because there was no hearing, however, the court did not have to ensure that Taylor was present for the hearing. Because Vargas withdrew her motion, the court never heard it, and Taylor never had to be present during a hearing on it. Nor, contrary to Taylor's assertion, was his court-appointed counsel ineffective for failing to argue Vargas's motion to substitute in and continue the trial. It was Vargas's motion. She was the one who could file it, argue it, or, as occurred, withdraw it. There was nothing for Taylor's court-appointed attorney to argue. Taylor cites no authority for the proposition that an attorney has an obligation to argue the merits of a motion filed by a different attorney.[5]

Taylor argues that Vargas rendered ineffective assistance of counsel when she failed to request Taylor's presence during the hearing (which did not occur) and when she withdrew her motion based solely on a tentative ruling, rather than asking for a hearing and a ruling on her motion. Taylor argues that "[r]easonably competent defense attorneys, acting as diligent advocates, simply do not withdraw motions based on an adverse tentative ruling."

Even if Vargas's withdrawal of her motion (rather than arguing it) fell below an objective standard of reasonableness, and even if such an error (and not the family's decision) resulted in representation by the court-appointed lawyer rather than Vargas,[6]

---

[5]    Taylor's court-appointed attorney may have had a duty (in protecting Taylor's right to counsel of his choice) to urge Vargas not to withdraw the motion and to argue the motion on the record, in order to preserve the issue for appeal. But even if Taylor's court-appointed attorney had implored Vargas not to withdraw her motion without a hearing, there is no reason to believe Vargas would have stayed in the courtroom and argued the motion.

17

Taylor has not satisfied his burden of showing prejudice. Taylor's only argument of prejudice is that the ineffective assistance of counsel led to a denial of his Sixth Amendment right to counsel of choice, which is per se prejudicial. Taylor cites no authority for the proposition that there is an exception to the prejudice requirement of *Strickland* for ineffectiveness in protecting a defendant's right to counsel of choice. Although there are limited exceptions to the *Strickland* prejudice requirement, ineffective assistance of counsel for failing to protect a defendant's counsel of choice, particularly in the circumstances of this case, is not one of them.[7]

C.     *Any Violation of Taylor's Right to Confrontation Was Harmless*

Taylor argues that the trial court violated his Sixth Amendment right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) when the court admitted Detective Stonich's testimony repeating out-of-court statements by Harper, Lexy Bowen, and Rembert. We conclude that Taylor forfeited his right to challenge the admissibility of the statements by Lexy Bowen and Rembert, and that the trial court's error in admitting Harper's statements was harmless.

To evaluate whether the court violated Taylor's Sixth Amendment right to confrontation, we first determine whether Taylor preserved the objection for appellate review. (See *People v. Valdez* (2012) 55 Cal.4th 82, 143 ["'[f]ailure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure deprives the trial court of the opportunity to correct potential error in the first instance'"]; *People v. Romero* (2008) 44 Cal.4th 386, 411 ["'"as a general rule, 'the

---

[6]     The settled statement suggests that Vargas withdrew because Taylor's "wife or girlfriend" told Vargas, who had been retained by Taylor's family, to let the deputy public defender represent Taylor at trial.

[7]     One exception is "'the complete denial of counsel . . . at a critical stage of [the] trial.'" (*People v. Hernandez*, *supra*, 53 Cal.4th at p. 1104.) Taylor, however, did not suffer a "complete denial of counsel"; he was represented by his court-appointed attorney.

18

failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal,'"'"'" and this rule "'"'"applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights"'"'"].)  Second, we determine under *Crawford* whether the out-of-court statements were "[t]estimonial statements of witnesses absent from trial," as defined in *Crawford*. (*Crawford, supra*, 541 U.S. at p. 59; see *People v. Pearson* (2013) 56 Cal.4th 393, 462.) Third, if the trial court erred by admitting the statements, we determine whether the resulting error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  (See *People v. Bryant* (2014) 60 Cal.4th 335, 395 ["'"'"[c]onfrontation clause violations are subject to federal harmless-error analysis under *Chapman*'"'"'"]; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681 [an otherwise valid conviction should not be set aside because of a violation of the right to confrontation if, on the whole record, the constitutional error was harmless beyond a reasonable doubt].)  "Th[e] [*Chapman*] test requires the People . . . 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.)

As noted, the trial court conducted a hearing pursuant to Evidence Code section 402 regarding the admissibility of the statements to Detective Stonich.  The only testimony at the hearing, however, was Detective Stonich's testimony about statements by Harper.  There was no testimony about statements by Bowen or Rembert to Detective Stonich.  At the end of the Evidence Code section 402 hearing, counsel for Taylor addressed only Harper's statements:  "I would object to the introduction of those statements on Sixth Amendment grounds since the testimony of that nature, I'm not going to have a chance to cross-examine Ms. Harper."  Thus, Taylor did not forfeit his right to argue the trial court erred in admitting Harper's testimonial statements to Detective Stonich.  (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 ["[a] properly directed motion *in limine* may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal"]; *People v. Mayfield* (1997) 14 Cal.4th 668, 731-732 [objection during the Evidence Code section 402 hearing preserved the objection for

appeal], disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)

Taylor, however, did not object at trial when the People asked Detective Stonich about what Bowen had said to her.[8] And the People never elicited any testimony about Rembert's statements to Detective Stonich. In fact, during cross-examination, counsel for Taylor questioned Detective Stonich about Bowen's statements, and elicited testimony about the statements Rembert made to Detective Stonich. Therefore, Taylor forfeited his *Crawford* challenge to the statements by Bowen and Rembert. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1215.)

Taylor argues that his objection at the Evidence Code section 402 hearing "necessarily" applied to all in-custody statements made by Harper, Bowen, and Rembert. There is nothing in the record, however, suggesting that Taylor's objection applied to anything other than Detective Stonich's testimony about Harper's statements. Nor did Taylor "secure an express ruling from the court" (*People v. Ramos, supra,* 15 Cal.4th at p. 1171) that statements by Rembert or Bowen were inadmissible. In fact, it appears that for strategic reasons Taylor wanted to introduce through Detective Stonich's testimony statements by Bowen and Rembert, in an effort to bolster his theory that Randall, and not Taylor, was their pimp.

Taylor further argues that, "once the trial court overruled the *Crawford* objection as to Harper's in-custody testimonial statements, any further specific *Crawford*

---

[8] Specifically, the prosecutor asked Detective Stonich, "[A]t some point in time did you have an opportunity to speak with Ms. Bowen?" After counsel for Taylor did not object, Detective Stonich answered, "Yes." The prosecutor asked, "[W]hat did Ms. Bowen tell you specifically about her relationship with the defendant?" After counsel for Taylor again did not object, Detective Stonich answered, "She's a prostitute and she's been working for him for about a month." The prosecutor also asked the detective, "Did she tell you whether or not she gave him money for her prostitution acts?" After counsel for Taylor still did not object, Detective Stonich answered, "Yes." Finally, the prosecutor asked, "What did she say?" After counsel for Taylor again did not object, Detective Stonich answered, "She said she gave all her money to either him or his pimp partner, Randall."

objections to Rembert's and Bowen's in-custody statements that were obtained under identical circumstances would have been futile," and therefore counsel for Taylor did not need to object. Not here. An objection is futile if objecting would have been "fruitless" or an "idle act." (*People v. Kitchens* (1956) 46 Cal.2d 260, 263; *People v. Curlee* (2015) 237 Cal.App.4th 709, 715; *People v. Hopkins* (1992) 10 Cal.App.4th 1699, 1702.) Nothing in the record suggests that an objection to the statements by Rembert or Bowen to Detective Stonich would have been fruitless or idle, nor did the trial court ever indicate that it intended to exclude an entire class of evidence based on the court's rulings on Harper's written and oral statements. (See *People v. Schmies* (1996) 44 Cal.App.4th 38, 54, fn. 9 ["'[w]here an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal,'" quoting *Beneficial Fire & Casualty Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 522].) Taylor's objection to testimony about different statements made by other witnesses, even on the same legal ground as his objection to Harper's statements, would not have been futile. (See *People v. Redd* (2010) 48 Cal.4th 691, 745 [although the defendant objected to six of the 18 instances of claimed misconduct, the court found "no support for the assertion that it would have been futile to interpose [additional] objections"].)

Taylor's reliance on *People v. Chism* (2014) 58 Cal.4th 1266 in support of his futility argument is misplaced. In *Chism* the defendant did not join in his codefendant's objections. (*Id.* at p. 1291.) The Supreme Court nevertheless considered the merits of the defendant's contention because the defendant "had no reasonable basis to present additional information that might have altered the trial court's ruling." (*Ibid.*) Thus, the defendant in *Chism* "could have reasonably believed making his own [identical] motion would have been futile." (*Ibid.*) Here, there were no objections to the testimony by Detective Stonich about the statements by Bowen or Rembert (and, as noted, counsel for Taylor elicited some of those statements).

21

Which leaves Harper's statements, the admission of which Taylor objected to at trial, and whether they were testimonial. "'Testimony[ ]' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" (*Crawford v. Washington, supra,* 541 U.S. at p. 51.) Statements made during police interrogation "'"are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."'" (*People v. Chism, supra*, 58 Cal.4th at p. 1288.) "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford*, *supra*, at p. 59.)

The statements by Harper were testimonial because she made them during police interrogation in the absence of any ongoing emergency, and because the primary purpose of the interrogation was to gather information for the criminal prosecution.[9] The record does not indicate, and the People do not argue, that Harper was unavailable at trial, or that counsel for Taylor had the opportunity to cross-examine her.[10] (See *People v. Sanchez* (2016) 63 Cal.4th 411, 440 ["[i]n a criminal case, the prosecution bears the burden of showing that the witness is unavailable"].) Thus, the admission of Harper's statements violated Taylor's right to confrontation.

The trial court's error in admitting Harper's statements, however, was harmless beyond a reasonable doubt. (See *People v. Bryant*, *supra*, 60 Cal.4th at p. 395 [an error is harmless under *Chapman* if "it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error"].) Whether a violation of the Sixth

---

[9]     The statements by Bowen and Rembert were also testimonial. As noted, however, Taylor forfeited his argument that their admission was erroneous.

[10]     Again, this is also true for Bowen and Rembert. The record similarly does not indicate, and the People do not argue, that Bowen and Rembert were unavailable or that counsel for Taylor had the opportunity to cross-examine them.

22

Amendment's confrontation clause "'is harmless in a particular case depends upon a host of factors [including] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" (*People v. Hernandez*, *supra*, 53 Cal.4th at p. 1108, quoting *Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 684.)

Here, overwhelming evidence supported the jury's guilty verdict on the pimping count, and Harper's statements were cumulative.[11]  Although the court erred when it admitted Detective Stonich's testimony that Harper told her she was working as a prostitute and that she gave the money she earned from prostitution to Taylor as her pimp, the jury heard evidence of these same facts (that Taylor was a pimp who took money from women working as prostitutes) many other times throughout the trial.  For example, Deputy Lloyd testified that Daise had told him that she had sex with people for money and gave the money to Taylor, and Daise testified that she "may have" said this to Deputy Lloyd.  Sisneros testified that Taylor told her that he was a pimp and she was going to work for him as a prostitute.  Sisneros also testified that he told two other women to "prostitute theirself," dropped them off at a truck stop, and picked them up hours later.  Finally, Detective Stonich testified without objection that Bowen said she had been working as a prostitute for Taylor for about a month, and that she gave "all her money to either him or his pimp partner, Randall."  In light of this evidence, we can conclude beyond a reasonable doubt that a rational jury would have reached the same verdict even if the court had excluded Detective Stonich's testimony about Harper's statements.

---

[11]     "[A]ny person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution . . . is guilty of pimping." (§ 266h.)

D.      *Any Error in Admitting the Text-Message Exchanges Was Harmless*

Taylor argues that the text-message exchanges from his cell phone constituted inadmissible hearsay and were obtained in violation of the Fourth Amendment, and that the trial court's error in admitting the text messages was prejudicial because "absent the error, there exists a reasonable probability of a more favorable result." Although the court should have excluded the text messages, the error was harmless.

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subds. (a), (b); see *People v. Cowan* (2010) 50 Cal.4th 401, 472.) The text messages were out-of-court statements between Taylor and Harper, between Taylor and Rembert, and between Taylor and Bowen. And the People introduced the text messages for the hearsay purpose of showing that the other women in the van were working as prostitutes for Taylor.[12]

The trial court's error in admitting the text-message exchanges over Taylor's hearsay objection, however, was harmless, despite the fact that, as Taylor points out, the prosecutor discussed the text messages in closing argument. We review the erroneous admission of hearsay evidence for harmless error under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 of whether it is "reasonably probable that the error affected the outcome of the trial." (*People v. Harris* (2005) 37 Cal.4th 310, 336.) We

---

12      The People do not argue that the prosecutor sought to admit the text messages for the non-hearsay purpose of showing Taylor's intent to recruit Sisneros to work for him as a prostitute. (See Evid. Code, § 1250; *People v. Scally* (2015) 243 Cal.App.4th 285, 292 [trial court properly admitted text messages to show intent where "[d]efendant's argument at trial was, essentially, that defendant was an innocent bystander, a helpful boyfriend who took no part in [the prostitute's] independent prostitution activity"].) Nor do the People argue that Taylor's statements (his outgoing text messages) were admissible as admissions. (See *People v. Kovacich* (2011) 201 Cal.App.4th 863, 892.) The People focus only on the messages the prosecutor referenced in closing argument— the "text messages to [Taylor]."

24

review any error arising out of the admission of the text messages in violation of the Fourth Amendment under the harmless-beyond-a-reasonable-doubt standard of *Chapman*.  (See *ibid.*)[13]

The evidence supporting Taylor's conviction for pimping, even without the text-message exchanges (and without Harper's erroneously admitted statements), was overwhelming.  The jury heard Deputy Lloyd's testimony about what Daise told him— that she had sex with people for money and gave the money to Taylor; Sisneros's testimony that Taylor told her he was a pimp and she was going to work for him, and that he instructed two other women to "prostitute theirself"; and Detective Stonich's testimony that Bowen said she had been working as a prostitute for Taylor for about a month, and that she gave "all her money to either him or his pimp partner, Randall."  This compelling evidence was uncontroverted.  Therefore, the court's error in admitting the text messages was harmless under either *Chapman* or *Watson*.  (See *People v. Houston* (2012) 54 Cal.4th 1186, 1222 [errors were harmless under either *Chapman* or *Watson* "[g]iven the overwhelming evidence of defendant's guilt"]; *People v. Sanchez* (2014) 228

---

[13]    Although Taylor did not raise a Fourth Amendment objection to the admission of the text messages at trial, at the time of his trial California did not recognize the warrantless search of a defendant's cell phone incident to his lawful arrest as a violation of the Fourth Amendment.  (See *People v. Diaz* (2011) 51 Cal.4th 84, 88 (*Diaz*).)  After Taylor's trial (but before his appeal) the United States Supreme Court held that such a search does violate the Fourth Amendment.  (See *Riley v. California* (2014) ___ U.S. ___, _\_\_, 134 S.Ct. 2473, 2485.)  Therefore, Taylor's failure to object on Fourth Amendment grounds is excusable because the trial court was bound to follow governing law at the time (*Diaz*) and it would be "'''"'an unreasonable burden on defendants to anticipate unforeseen changes in the law.'"''''  (*People v. Rangel*, *supra*, 62 Cal.4th at p. 1215.)  In the meantime, the California Supreme Court has granted review to decide whether the exclusionary rule applies to evidence from a cell-phone search conducted incident to an arrest after *Diaz* but before *Riley*.  (See *People v. Macabeo*, review granted Nov. 25, 2014, S221852; see also *Davis v. U.S.* (2011) 564 U.S. 229, 248-250 [the exclusionary rule does not apply "when the police conduct a search in objectively reasonable reliance on binding appellate precedent" and have "scrupulously adhered to governing law"].)  We do not reach this issue because the error in admitting the text messages is harmless under both *Watson* and *Chapman*.

25

Cal.App.4th 1517, 1535 [both "harmless error standards met when the evidence of guilt is so strong that the jury would have reached the same verdict regardless of the error"].)

E. *There Was Sufficient Evidence to Support the Convictions for Active Participation in a Criminal Street Gang and Battery with Serious Bodily Injury*

Taylor argues that there was insufficient evidence to support his convictions for active participation in a criminal street gang and battery with serious bodily injury. """"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*People v. Rangel*, *supra*, 62 Cal.4th at p. 1212.) After reviewing the record, """"presum[ing] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence"""" (*id.* at p. 1213), we conclude that there is sufficient evidence to support the jury's findings that Taylor was guilty of active participation in a criminal street gang, and that he battered Daise causing serious bodily injury.

1. *There Was Sufficient Evidence of Active Participation in a Criminal Street Gang*

"The elements of the gang participation offense in section 186.22(a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) Taylor appears to argue only that there is insufficient evidence to support the jury's finding on the third element; i.e., that Taylor willfully promoted, furthered, or assisted in any felonious criminal conduct by

members of his gang. "[T]o satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member."[14] (*People v. Rodriguez*, at p. 1132; see *People v. Velasco* (2015) 235 Cal.App.4th 66, 75 [the second gang member must be a member of the same gang as the defendant].)

There was sufficient evidence, viewed in the light most favorable to the verdict, for a reasonable jury to find that Randall was Taylor's "pimp partner"; i.e., a fellow Elm Street gang member Taylor worked with while pimping in order to earn money for the gang. First, there was evidence that Randall and Taylor pimped together. Bowen stated that "she gave all her money [from prostitution] to either [Taylor] or his pimp partner, Randall," whom she knew by the moniker Poodah. Sisneros testified that Taylor and Randall exchanged something immediately before their arrests (although she could not see what it was). When arrested, Taylor had $300 and Randall had $2,000, which

---

[14] The trial court correctly instructed the jury pursuant to CALJIC No. 6.50 on the third element of active participation in a criminal street gang ("willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang"). Taylor did not object to the instruction, ask that the court add any language to it, or ask the court to give CALCRIM No. 1400, which at the time of Taylor's trial provided: "At least two members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang." (See *People v. Vega* (2015) 236 Cal.App.4th 484, 505 fn. 11 ["[t]his amended version of the instruction first appeared in the Fall 2013 edition of CALCRIM"].) At trial neither the prosecutor nor counsel for Taylor argued that Taylor committed (or did not commit) the crime of pimping with another member of the same gang. On appeal, Taylor does not argue the jury instruction was erroneous or he was "denied his due process right to have his jury determine each fact necessary to his conviction beyond a reasonable doubt." (*People v. Vega*, *supra*, 236 Cal.App.4th at p. 505.) Taylor argues only "there is no evidence from which a jury could reasonably conclude defendant directly committed a crime with gang members." The People ignore this argument and do not contend there was substantial evidence that at least two gang members committed the felonious conduct in this case, as required by *People v. Rodriguez*, *supra*, 55 Cal.4th at p. 1132.

supported the inference that the exchange Sisneros witnessed involved Taylor giving cash (that he earned through pimping) to Randall.

Second, there was expert testimony establishing that pimp partners work together in order to benefit their gang. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 698 [expert testimony about "general gang behavior" and descriptions of a particular gang's conduct can be "relevant and admissible"]; *People v. Velasco*, *supra*, 235 Cal.App.4th at p. 78, fn. 4 [the Supreme Court has "observ[ed] that culture and practices of criminal street gangs are matters outside the common experience of jurors justifying expert witness testimony to explain how certain activity might be gang related"]; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 ["[i]t is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation"].) Specifically, Detective Richard Sanchez, who teaches classes on gang-subculture throughout the United States, testified that pimps have business partners who help each other earn money for their gang. They collect money for and transfer money to each other and to other members of the same gang. Detective Sanchez explained that, if a pimp's prostitute is a "very attractive girl bringing in a lot of money," "she's the bread and butter for the gang." One of the reasons for the pimping "partnership" is that, if one of the pimps is incarcerated, his partner can "take over" his "money-making girl" in order to "keep that female in that gang doing the same thing" in his absence, so that she will keep "bringing in money" for the gang. From this evidence, a reasonable jury could find that Taylor and Randall were pimp partners— members of the same gang who worked together in the criminal conduct of pimping. (See *People v. Ferraez*, *supra*, 112 Cal.App.4th at p. 930 ["expert's testimony was circumstantial evidence, but it was still evidence supporting defendant's conviction" for active participation in a criminal street gang].)

2. *There Was Sufficient Evidence of Battery with Serious Bodily Injury*

Section 243, subdivision (d), provides for increased punishment "[w]hen a battery is committed against any person and serious bodily injury is inflicted on the person."

28

Section 243, subdivision (f)(4), provides: "'Serious bodily injury' means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement."

Relying on section 243, subdivision (f)(5), which defines "injury" as "any physical injury which requires professional medical treatment," Taylor argues that, because Daise did not receive any medical treatment, she did not suffer an "injury," and therefore did not suffer serious bodily injury. The court in *People v. Wade* (2012) 204 Cal.App.4th 1142 rejected this argument: "If the Legislature had intended that 'serious bodily injury' means a 'serious impairment of physical condition' that *also* required medical treatment, it could have so provided. The separate definition of 'injury' in subdivision (f)(5) does not render ambiguous the clear language of subdivision (f)(4), because subdivision (f)(5) clearly applies to section 243, subdivision (c), for batteries against peace officers or other specified persons causing 'injury.'" (*Id.* at p. 1149.) For example, the court in *Wade* held that "a loss of consciousness that constitutes a 'serious impairment of physical condition' is a 'serious bodily injury' without any showing that the injury required medical treatment." (*Ibid.*) We agree with *Wade*.

And, contrary to Taylor's contention, there was substantial evidence that Taylor inflicted serious bodily injury on Daise. "Subdivision (f)(4) of section 243 provides that the 'impairment[s] of physical condition[s]' that constitute 'serious bodily injury' 'includ[e] but [are] not limited to' the list that follows; in other words, the list is not exclusive." (*People v. Belton* (2008) 168 Cal.App.4th 432, 440.) The evidence included a photograph of Daise's injuries showing a bloody lip, a large lump over her eye, and a chipped tooth, and the testimony of Deputy Lloyd describing Daise's injuries and how Daise said Taylor had hit her and caused those injuries. (See *id.* at pp. 436, 440 [defendant guilty of battery with serious bodily injury where the victim lost "part of a tooth" and had "wounds requir[ing] sutures on one eyebrow and two places on her mouth"].)

29

F.    *The Trial Court Did Not Commit Instructional Error*

Taylor argues that the trial court erred in failing to give the jury two instructions Taylor asserts the court had a sua sponte duty to give. First, Taylor contends the court should have given the jury a unanimity instruction on the counts for pimping and active participation in a criminal street gang. Second, he contends the court should have given the jury an instruction defining aiding and abetting because the jury may have convicted him on an aiding and abetting theory without understanding what aiding and abetting means. There is no merit in either contention.

1.    *Unanimity Instructions Were Not Required*

A jury verdict in a criminal case must be unanimous. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 569; see Cal. Const., art. I, § 16.) "[E]ach individual juror must be convinced, beyond a reasonable doubt, that the defendant committed the *specific* offense he is charged with." (*People v. Hernandez*, *supra*, at p. 569.) "As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) "The unanimity instruction must be given sua sponte, even in the absence of a defense request to give the instruction." (*People v. Hernandez*, *supra*, at p. 569.) Nevertheless, "[i]f the case falls within the continuous-course-of-conduct exception, which arises . . . 'when the statute contemplates a continuous course of conduct or a series of acts over a period of time,'" a unanimity instruction is not required. (*People v. Jennings*, *supra*, at p. 679.)

The unanimity exception for a continuous course of conduct "includ[es] pimping and pandering." (*People v. Leonard* (2014) 228 Cal.App.4th 465, 491; see *People v. Jenkins* (1994) 29 Cal.App.4th 287, 299 ["[t]he continuous course of conduct exception has been 'applied to varying crimes that cover "'repetitive or continuous conduct'"' [citation] such as . . . pimping'"]; *People v. Dell* (1991) 232 Cal.App.3d 248, 265-266

30

["both pimping and pandering have been held to be crimes of a continuous ongoing nature and are therefore not subject to the requirement the jury must agree on the specific act or acts constituting the offense"].) Therefore, the trial court did not have a sua sponte duty to instruct the jury on unanimity for the pimping count.

Taylor also argues that, because the active participation in a criminal street gang count was based on the same felonious conduct as the pimping count, the trial court had a sua sponte duty to give a unanimity instruction for both counts. Because the underlying conduct for both counts was continuing and ongoing, however, the court did not have a sua sponte duty to give a unanimity instruction for either.

2.      *An Instruction Defining Aiding and Abetting Was Not Required*

Taylor argues that, because the trial court instructed the jury pursuant to CALJIC No. 6.50 that the People could prove the last element of the active participation in a criminal street gang count by showing Taylor "either directly and actively committed or aided and abetted other members of that gang in committing the crimes of pimping and pandering," the court should have instructed the jury on the definition of aiding and abetting. According to Taylor, without such an instruction "[t]he jury was free to define aiding and abetting in any manner it chose," with the result that "there is no evidence that the jury arrived at its verdicts on a legally valid theory."

The People, however, did not proceed on an aiding and abetting theory. "Instructions on aiding and abetting are not required where '[t]he defendant was not tried as an aider and abettor, [and] there was no evidence to support such a theory.'" (*People v. Young* (2005) 34 Cal.4th 1149, 1201; see *People v. Whitmer* (2014) 230 Cal.App.4th 906, 926 ["the jury need not receive instructions on aiding and abetting when the prosecutor tries the case on the theory that the defendant was one of the direct perpetrators of the crimes, neither side relies on an aiding and abetting theory, and no evidence is presented suggesting that the defendant acted merely as an aider and abettor of the crimes"].) There was no evidence that Taylor merely aided and abetted other pimps. Indeed, not only did the trial court not have a sua sponte duty to give an aiding

31

and abetting instruction, it would have been error for the trial court to have given such an instruction. (See *People v. Debose* (2014) 59 Cal.4th 177, 205 ["'[i]t is error to give an instruction [that], while correctly stating a principle of law, has no application to the facts of the case'"].)[15]

If there were any instructional error, it was when the court instructed the jurors that they could convict Taylor as an aider and abettor, not when the court failed to give the jury a definition of aiding and abetting. To the extent Taylor may be arguing not that the court failed to define aiding and abetting but that the court failed to remove the phrase "or aided and abetted other members of that gang in committing" from the CALJIC jury instruction on active participation in a criminal street gang, Taylor forfeited the argument. Taylor did not ask the trial court to strike that phrase or otherwise object to those words in the instruction. "Generally, '"'[a] party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'"'" (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849.) The court's instruction was a correct statement of the law (see *People v. Rodriguez*, *supra*, 55 Cal.4th at pp. 1135-1136), and Taylor does not argue otherwise. If Taylor "believed that the instruction was inaccurate in the facts presented in [his] case, he was obliged to object to it or to request clarification or modification, which he failed to do." (*People v. Canizalez*, *supra*, at p. 849.) Therefore, he forfeited any argument that the court should have modified the instruction on active participation in a criminal street gang. (See *ibid.*) In any event, any such instructional error was harmless because there was overwhelming evidence that Taylor

---

[15] Taylor points out that the prosecutor mentioned aiding and abetting during closing argument while discussing the active participation in a criminal street gang count. The prosecutor, however, did not argue that Taylor was guilty as an aider and abettor; he simply parroted the jury instruction before explaining how the evidence supported a conviction based on Taylor having (directly and actively) committed the felony of pimping to support the substantive crime of active participation in a criminal street gang. The prosecutor similarly recited the jury instructions on each crime with which Taylor was charged before explaining how the evidence supported a guilty verdict for those crimes.

directly and actively committed the crimes (and no evidence that he did so as an aider and abettor).

G. *The Trial Court Did Not Err in Sentencing Taylor*

1. *The Trial Court Did Not Err in Imposing Sentencing Enhancements and Consecutive Sentences*

Under section 667, subdivision (a)(1), "any person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately." Section 667, subdivision (a)(4), provides that "'serious felony' means a serious felony listed in subdivision (c) of Section 1192.7." As relevant here, section 1192.7 subdivision (c)(8), defines "serious felony" as "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice."

Taylor argues that the trial court erred in imposing a five-year enhancement under section 667, subdivision (a)(1), because none of his current offenses constitutes a "serious felony." Specifically, Taylor argues that the battery with serious bodily injury does not constitute a "serious felony" within the meaning of section 1192.7, subdivision (c). According to Taylor, while section 1192.7, subdivision (c)(8), provides that "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice," is a "serious felony," inflicting serious bodily injury under section 243, subdivisions (d) and (f)(4), is not inflicting great bodily injury under section 1192.7, subdivision (c)(8). In other words, Taylor argues that "serious" is not "great."

California law is to the contrary. "'[S]erious bodily injury,' as used in section 243, is '"essentially equivalent"' to '"great bodily injury,"' as used . . . in the section 12022.7 enhancement for the infliction of such injury on a person during the commission of a felony." (*People v. Wade*, *supra*, 204 Cal.App.4th at p. 1149; see *People v. Moore* (1992) 10 Cal.App.4th 1868, 1870 ["a felony battery committed by means of 'serious

33

bodily injury' (Pen. Code, § 243, subd. (d)) may be used to enhance a sentence under the 'serious felony' provisions of Penal Code section[ ] 667, subdivision (a), because the term 'serious bodily injury' is essentially equivalent to and synonymous with the term 'great bodily injury,' as required by Penal Code section 1192.7, subdivision (c)(8)"].)[16] Therefore, the battery conviction qualifies as a "serious felony" for the purposes of section 667, subdivision (a)(1), and the trial court properly imposed the five-year prior serious felony enhancement.[17]

Taylor also argues that "the mandatory consecutive sentence imposed for the count 1 battery with serious bodily injury conviction should be vacated because it is an unauthorized sentence." Specifically, he argues the trial court "'misunderstood the scope of its discretion'" to impose a sentence for the battery with serious bodily injury conviction that would run concurrent with his other sentences, "'and erroneously believed consecutive sentences were mandatory.'" Section 1170.12, subdivision (a), provides,

---

[16] Taylor points out that "during closing arguments the prosecutor expressly told the jury that there was a distinction between serious bodily injury and great bodily injury." This misstatement of the law (to which Taylor did not object) is irrelevant because the jury was only determining whether Daise's injuries constituted serious bodily injury. Also, although Taylor argues that the prosecutor conceded that "the injuries inflicted upon . . . Daise amounted only to serious bodily injury," the record contains no such concession.

[17] Taylor argues that using the gang benefit enhancement under section 186.22, subdivision (b)(1), to elevate either the pimping or battery conviction to a serious felony (under section 1192.7, subdivision (c)(28), which provides that "any felony offense, which would also constitute a felony violation of Section 186.22" constitutes a "'serious felony'"), in order to enhance his sentence under section 667, subdivision (a), would be "bootstrapping," essentially punishing him twice for the gang benefit enhancement. We need not address this issue because the battery conviction qualifies as a "serious felony" independent of the section 186.22, subdivision (b)(1), gang benefit enhancement. In any event, Taylor concedes that, if we reject (as we have) his arguments for reversal of his conviction for violating section 186.22, subdivision (a), the substantive offense of active participation in a criminal street gang, that conviction is a separate, sufficient foundation for the enhancement under section 667, subdivision (a).

34

"Notwithstanding any other provision of law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more prior serious and/or violent felony convictions, as defined in subdivision (b), the court shall adhere to each of the following: . . . (7) If there is a current conviction for *more than one* serious or violent felony as described in subdivision (b), the court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law." (§ 1170.12, subd. (a)(7), italics added.) Section 1170.12, subdivision (b)(1), in relevant part, defines a serious felony as any offense listed in subdivision (c) of section 1192.7. (§ 1170.12, subd. (b)(1).)

As noted, Taylor's conviction for battery with serious bodily injury is a "serious felony" under section 1192.7, which was the first serious felony conviction for purposes of section 1170.12, subdivision (b)(7). The second serious felony conviction was Taylor's conviction for active participation in a criminal street gang. Taylor was convicted of violating section 186.22, subdivision (a), and he concedes that that conviction constitutes a serious felony conviction. Thus, because there were current convictions for two "serious felonies," mandatory consecutive sentencing under section 1170.12 was appropriate.

2. *The Trial Court Did Not Violate Section 654 in Sentencing Taylor*

Taylor argues that the trial court violated section 654 by imposing sentences for both the battery with great bodily injury and pimping convictions and not staying the shorter of the two sentences. We conclude that the trial court properly punished Taylor for both because the two crimes involved separate intents and objectives.

Section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute "prohibits multiple punishment for a single physical act that violates different provisions of law." (*People v.*

35

*Jones* (2012) 54 Cal.4th 350, 358.) "'"'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'"'" (*People v. Capistrano* (2014) 59 Cal.4th 830, 885.) "'If [the] defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."'" (*People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1005.)

"'"'The defendant's intent and objectives are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced.'"'" (*People v. Capistrano, supra,* 59 Cal.4th at p. 886.) "The 'intent and objective' test is a rigorous one, however, since 'a "broad and amorphous" view of the single "intent" or "objective" needed to trigger the statute would impermissibly "reward the defendant who has the greater criminal ambition with a lesser punishment."'" (*People v. Morelos* (2008) 168 Cal.App.4th 758, 769.)

"A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618; see *People v. Morelos, supra,* 168 Cal.App.4th at p. 770 [the trial court, not the jury, determines whether multiple crimes arose from a single objective].) "'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact

the trier of fact could reasonably deduce from the evidence.'" (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)[18]

Although the trial court did not make an express finding, the court's decision to sentence Taylor to separate terms for the battery with serious bodily injury conviction and for pimping implied a finding that the two crimes were distinct offenses with distinct objectives. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 ["the imposition of concurrent terms is treated as an implied finding that the defendant bore multiple intents or objectives, that is, as a rejection of the applicability of section 654"]; *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1564-1565 ["implicit in the trial court's concurrent sentencing order is that defendant entertained separate intentions"].)

Substantial evidence supports the court's implied finding that Taylor had multiple objectives when he committed the battery with serious bodily injury. There was substantial evidence that when Daise, whom Taylor had been dating for three years, confronted Taylor with allegations of infidelity, Taylor's intent and objective in inflicting serious bodily injury was not only, as the prosecution's gang expert testified, to keep a member of his "herd under control." In addition, Daise and Taylor argued after she confronted him with evidence that he had cheated on her. The court could reasonably find that Taylor intended to hurt Daise out of anger or defensiveness, or because he wanted to deflect her attention away from his infidelity. This is not a case where "[e]ach intent was dependent on, and incident to, the other." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1034; cf. *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 ["the evidence does not suggest any intent or objective behind the kidnapping other than to facilitate the rapes"]; *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1215 ["[w]here the commission of one offense is merely '"a means toward the objective of the commission of the other,"' section 654 prohibits separate punishments for the two offenses"]; *People*

---

[18] Where section 654 prohibits multiple punishment, "the accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.'" (*People v. Jones*, *supra*, 54 Cal.4th at p. 353.)

*v. Vu*, *supra*, 143 Cal.App.4th at p. 1034 ["single criminal intent or objective was to avenge [another gang member's] killing by conspiring to commit murder"].)

The fact that the jury found both the battery and the pimping were committed with the intent to promote a gang (the pimping because it brings money into the gang, and the battery because it facilitates the pimping) does not mean the two crimes had entirely identical intents and objectives. "'[T]o accept . . . a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate [section 654's] purpose to insure that a defendant's punishment will be commensurate with his culpability.'" (*People v. Jones* (2001) 25 Cal.4th 98, 110, fn. 7; accord, *People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1116.) Because the two crimes involved separate intents (albeit with a shared "'broad, overriding intent and objective'"), the court did not err in imposing the consecutive sentence for battery with serious bodily injury.[19]

### H. *Cumulative Error Does Not Require Reversal*

Taylor's final argument is that the trial court's errors, though perhaps individually harmless, were cumulatively prejudicial. According to Taylor, "[t]he denial of a fair trial was complete and transformed into a farce once the prosecutor took off his clothes (jacket, pants, shirt, tie and shoes) during [closing] argument to illustrate a non-contested proposition of law that verdicts must be based on evidence."

"'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'" (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) "[W]e reverse the judgment if there is a 'reasonable possibility' that the jury would have

_____

[19]     The Supreme Court has "said frequently [that] the purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability." (*Correa*, *supra*, 54 Cal.4th at p. 341.) Taylor's argument would immunize him from further punishment for any other crime a pimp might commit in the course of pimping, regardless of his culpability. In other words, by Taylor's logic, a pimp could commit many different violent crimes in the course of pimping without any possibility of further punishment (unless the punishment for one of those crimes exceeded the punishment for pimping). Perhaps for this reason, Taylor cites no authority for the proposition that section 654 prohibits punishment for pimping and related crimes.

38

reached a result more favorable to the defendant absent a combination of errors." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 361.)  We do not reverse for cumulative error where, as here, "the errors are relatively few and . . . the prejudicial effect was in each instance minimal to nonexistent."  (*People v. Hinton* (2006) 37 Cal.4th 839, 872.)

The trial court erred only in admitting certain cumulative evidence—Harper's out-of-court testimonial statements and the four text-message exchanges.  And the prosecutor did engage in some unusual theatrics during his closing and rebuttal arguments.  Perhaps for strategic reasons, Taylor did not object when the prosecutor disrobed, referenced a pop star's penis, and shared with the jury an inappropriate "song" he wrote about the defendant's case.  (See *People v. Peoples* (2016) 62 Cal.4th 718, 797 [prosecutorial misconduct argument was "forfeited by defense counsel's failure to 'make a timely and specific objection to the alleged misconduct and request the jury be admonished to disregard it'"]; see, e.g., *People v. Kelley* (1977) 75 Cal.App.3d 672, 690 ["prosecutorial misconduct did not prejudice appellant's case, but to the contrary may have helped it by generating jury sympathy"]; *U.S. v. Spain* (7th Cir. 1976) 536 F.2d 170, 175 [prosecutors should avoid expressions with "emotive and pejorative connotations," which "tend to impair the calm and detached search for truth," but their use is "likely to be self-defeating, repelling jurors instead of convincing them"].)  Taylor points to the prosecutor's behavior only to support his cumulative-error argument.

"It is the duty of [every] attorney to . . . maintain the respect due to the courts of justice and judicial officers" (Bus. & Prof. Code, § 6068, subd. (b)) and to "'abstain from all offensive personality.'"  (*People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1258) "'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the State.'"  (*Ibid.*)  "'Prosecutors play a dual role in the criminal justice system; they are advocates, but they are also administrators of justice.'"  (*Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 557.)  """"It is their sworn duty to see that the defendant has a fair and impartial trial."""  (*Ibid.*)  "[W]hile [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones."  (*Berger v. U.S.* (1935) 295 U.S. 78,

88; accord *Bocanegra v. Jakubowski* (2015) 241 Cal.App.4th 848, 856.) In this case, the prosecutor should not have taken his clothes off during closing argument, used an offensive epithet to describe a witness ("Mexican prostitute"), referenced Justin Bieber's penis, or shared an original song that, at a minimum, made light of a serious case.

Nevertheless, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." (*U.S. v. Young* (1985) 470 U.S. 1, 11; see *Kelley*, *supra*, 75 Cal.App.3d at p. 675 [affirming conviction in light of the overwhelming evidence of the defendant's guilt, despite "conduct of the deputy district attorney [that] raises a serious question whether the trial . . . deteriorated into farce and sham"].) Viewing the trial as a whole, and considering the strength of the evidence supporting Taylor's convictions, these prosecutorial theatrics, along with any evidentiary errors, did not deprive Taylor of a fair trial.[20]

**DISPOSITION**

The judgment is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.                    ZELON, J.

---

[20] In a footnote, Taylor argues that we should also consider the prosecutor's reference in rebuttal argument to Cynthia Bowen having an "Active" tattoo on her body, which was a fact outside the record. Taylor concedes that his attorney at trial did not object to the prosecutor's reference to Bowen's tattoo. In addition, this isolated incident of referring to a matter outside the record did not deprive Taylor of a fair trial.